**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| Nannette Hutchens, | Case No. 3:19-cv-546-MHL |
| Plaintiff, | |
| v. | |
| Capital One Services, LLC; Capital One Financial Corp.; and Capital One, N.A. | |
| Defendants. | |
| | Case No. 3:19-cv-637-MHL |
| Virginia Stirnweis, | |
| Plaintiff, | |
| v. | |
| Capital One Services, LLC; Capital One Financial Corp.; and Capital One, N.A. | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' RULE 12(C)**
**MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

(CONSOLIDATED BRIEF FILED PURSUANT TO COURT ORDER)

i

## **INTRODUCTION**

Plaintiffs Virginia Stirnweis and Nannette Hutchens (collectively, "Plaintiffs"), move under Federal Rule of Civil Procedure 12(c) for a partial judgment on the pleadings confirming that they have not waived their right to pursue a collective action under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.* ("FLSA") or the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA").

After terminating Plaintiffs, Defendants Capital One Services, LLC, Capital One Financial Corp., and Capital One, N.A. (collectively "Capital One") conditioned Plaintiffs' receipt of severance pay on a purported waiver of Plaintiffs' statutory collective-action and joinder rights granted to them in Section 16(b) of the FLSA, 29 U.S.C. § 216(b), and Section 7(b) of the ADEA, 29 U.S.C. § 626(b).

These waivers frustrate Congress' careful design and are therefore unenforceable as against public policy. A "statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy." *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697, 704 (1945). The text, structure, legislative history, and purposes of the FLSA, Section 16(b), and the ADEA, all demonstrate that where parties have retained the judicial forum, allowing waiver of the right to proceed collectively or to join additional plaintiffs contravenes the intent of Congress and undermines the public policies these statutes were designed to address.

Cases holding that collective-action and other group-action rights may be waived in the context of arbitration and collective-bargaining agreements are not controlling. These cases employ an analysis that reconciles the congressional policies underlying the Federal Arbitration Act ("FAA") and the National Labor Relations Act ("NLRA") with those underlying the collective action mechanism found in the FLSA, ADEA, or other laws. This analysis simply does not apply to an agreement that retains the judicial forum. The primary policy concern animating Congress' adoption of the collective-action mechanism in the FLSA and ADEA was the desire to promote the effective and efficient vindication of the core substantive rights protected by those statutes by

1

easing the prohibitive burdens and costs that individual *litigation* imposes on employees and ensuring efficiency in the judicial system. These policy concerns, while in line with similar statutory policies favoring bilateral arbitration, cannot be reconciled with a statutory scheme that allows employers to force their employees into bilateral *court* litigation, with all the costs and burdens that imposes on plaintiffs, the judiciary, and the public.

The legislative policy, language, and structure of Section 16(b) strongly suggest that the right to a collective action necessarily attaches to the right to a judicial forum. Capital One wants to retain the benefit of a judicial forum, with all the procedural protections that come with it, while simultaneously stripping Plaintiffs of the congressionally-prescribed procedures for vindicating their own substantive rights in court. The collective-action and multi-party waivers in Plaintiffs' severance agreements are unenforceable. For these reasons, Plaintiffs' motion for partial judgment on the pleadings should be granted.

## BACKGROUND

### I.   Facts Relating to Plaintiff Stirnweis.

Capital One hired Stirnweis in 2009. (Stirnweis Compl. ¶¶ 7, 12, ECF No. 1.) During the relevant time period, Capital One employed her as a Corporate Insurance Specialist—also called a "risk specialist." (*Id.* at ¶¶ 7, 13.) As a risk specialist, Stirnweis' job was to serve as the support person for, and main point of contact between, Capital One and its workers' compensation insurance and property insurance vendors. (*Id.* at ¶ 16.) Her primary duties involved, among other things, reviewing insurance requirements established by higher-ups at Capital One, ensuring vendors were complying with those requirements, performing data entry, running reports, corresponding between insurance companies and banks, and engaging in insurance-related clerical duties. (*Id.* at ¶ 17.) Stirnweis regularly worked in excess of forty hours per week, often beginning her workday between 7 and 8 a.m., working through lunch until 6 p.m., and responding to emails and answering calls both before work and after-hours on her company-issued phone and laptop. (*Id.* at ¶ 32.)

Neither Stirnweis nor other risk specialists who performed similar work set the policies or insurance coverage criteria for Capital One. (*Id.* at ¶¶ 18, 20.) Rather, Stirnweis and other risk specialists followed and applied insurance coverage requirements that others at Capital One established, and risk specialists did not have the authority to waive or deviate from established policies and procedures. (*Id.* at ¶¶ 20-21, 26.) Risk specialists' job duties do not require them to exercise discretion or independent judgment involving matters of significance. (*Id.* at ¶¶ 22, 26.) Stirnweis' primary job duties' did not involve performing managerial tasks over other employees, and neither Stirnweis nor other risk specialists performed work directly related to the management or general business operations of Capital One or its customers. (*Id.* at ¶¶ 23-24, 26.)

Plaintiff Stirnweis alleges that Capital One willfully violated the FLSA by misclassifying her and other risk specialists as exempt from receiving overtime under the FLSA. (Stirnweis Compl., ECF No. 1 at ¶¶ 27-28, 36.) Accordingly, Stirnweis and other similarly situated risk specialists claim entitlement to one-and-one-half times their regular rate of pay for all hours worked in excess of forty per week. (*Id.* at ¶ 27.)

On or around January 5, 2019, Capital One terminated Stirnweis. (*Id.* at ¶ 60.) As a condition of providing severance pay, Capital One required Stirnweis to sign a "Letter of Agreement," drafted by Capital One, that purported to release "all claims of any kind" that she had against Capital One. (Stirnweis Compl. ¶ 61; Curwood Decl. Ex. 1.) It stated, "If you do not agree to the terms set forth in this Agreement, you will not receive any benefits." (*Id.*) The Letter of Agreement contained the following clause:

> If any claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Capital One or any of the other Released Parties is a party.

(*Id.*; Hutchens, Compl. Ex. 1, ECF No. 1-1.)

3

## II.     Facts Relating to Plaintiff Hutchens.

Capital One originally hired Hutchens in 2007 as a contractor. (Hutchen Compl. ¶ 12, ECF No. 1.) In 2010, Capital One converted her to an associate. (*Id.*) During the relevant time period, Hutchens worked as a Project Manager / Program Manager / IT Deliver Lead. (*Id.* at ¶ 14.)

Capital One utilizes a system for performance evaluations that places employees in one of five categories: "Exceptional," "Strong," "Very Strong," "Inconsistent," and "Action Required." (*Id.* at ¶¶ 16-17.) In performance reviews, Hutchens consistently received evaluations of "Strong," "Very Strong," and "Exceptional" at fulfilling her job duties. (*Id.* at ¶ 17.) Beginning in October 2017, however, Capital One began to implement a new, uniform corporate policy forcing managers to rank 12 percent of associates as "Action Required" or "Inconsistent" for not meeting expectations and provide a "coaching" or "performance improvement" plan to those associates. (*Id.* at ¶¶ 19, 21.) These "forced ranking" or "stacked ranking" policies resulted in employees who were objectively meeting performance expectations being falsely rated as poor performers. (*Id.* at ¶ 36, 38-39, 49). Capital One implemented a "No-Transfer" policy preventing employees rated "Inconsistent" from finding other roles at Capital One. (*Id.* at ¶ 24.) Capital One's highest executives also established new targets for "involuntary attrition," which refers to terminations that are "involuntary" to the employee, whether they be performance-based or job eliminations (i.e., restructuring). (*Id.* at ¶ 28.) This policy required Capital One's managers to involuntarily terminate between one-half and two-thirds of the employees who fell into the bottom two "buckets" in performance reviews. (*Id.* at ¶¶ 29, 31-32.)

At the same time Capital One was implementing its new forced ranking and involuntary attrition policies, it began engaging in a marketing, recruiting, and hiring campaign to attract recent college graduates to Capital One's Technology department. (*Id.* at ¶ 40.) At the time Hutchens filed her complaint, the program, known as the "Technology Development Program," was limited to hiring people who graduated college between the years of 2017 and 2020, which functionally set the hiring criteria to candidates in their early to mid-20s. (*Id.* at ¶ 43-44.) Capital One's Chief Information Officer has stated that he expects all hires into the Tech department to come in through

the Technology Development Program. (*Id.* at ¶ 41-42.) Capital One increased its involuntary attrition rate and implemented stacked rankings in order to make room to hire younger employees in their early-to-mid-twenties through the Technology Development Program. (*Id.* at ¶¶ 47, 50.)

Capital One's new policies, while facially neutral, had a disparate impact on employees over the age of 40. (*Id.* at ¶ 62.) Although Hutchens' job performance was strong, and despite her previous evaluations reflecting that strong performance, in spring of 2018 she was placed on a coaching plan as a result of Capital One's forced ranking policy. (*Id.* at ¶¶ 50-60.) She was 61 years old. (*Id.* at ¶ 60.) The very same supervisor placed another, 57-year-old employee on a coaching plan and performance improvement plan. (*Id.* at ¶ 60.) This employee and Hutchens were the two oldest employees managed by this supervisor. (*Id.* at ¶ 61.)

After being placed on the coaching plan, Hutchens was informed she was being terminated. (*Id.* at ¶ 1.)  As a condition of providing severance pay, Capital One required Hutchens to sign a "Letter of Agreement," drafted by Capital One, that for purposes of this motion is materially identical to Stirnweis' agreement. *See supra* at 3. Hutchens' agreement, like Stirnweis' agreement, was a contract of adhesion and purported to release "all claims of any kind" that she had against Capital One. (Hutchens Compl. ¶ 61; Hutchens, Compl. Ex. 1, ECF No. 1-1; Curwood Decl., Ex. 1.) Hutchens' agreement, like Stirnweis', contained the following clause:

> If any claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Capital One or any of the other Released Parties is a party.

(Hutchens, Compl. Ex. 1, ECF No. 1-1; Curwood Decl., Ex. 1.)

## III.    Procedural History.

Plaintiff Stirnweis brought an action on August 30, 2019 against Capital One, asserting a claim for failure to pay overtime in violation of the FLSA, 89 U.S.C. § 201. (Stirnweis Compl.)

Plaintiff Hutchens brought an action on July 30, 2019 against Capital One, asserting age discrimination pursuant to the Older Workers Benefits Protection Act ("OWBPA"), and the ADEA. (Hutchens Compl.)

Both Plaintiffs brought separate claims under the Declaratory Judgment Act seeking a judicial ruling that the provision of Capital One's severance agreement purporting to prevent Plaintiffs from pursuing their claims on a collective or multi-party basis is unenforceable. (Stirnweis Compl.; Hutchens Compl.)

At the initial pretrial conferences, this Court directed the parties to address whether the Plaintiffs, through their severance agreements, waived the right to bring a collective or multi-party action under the FLSA or ADEA. (Stirnweis, ECF No. 15; Hutchens, ECF No. 12.)

## ARGUMENT

### I. Standard of Review.

In a motion for judgment on the pleadings, the court applies "the same standard" as for motions to dismiss. *Burbach Broad Co. v. Elkins Radio Corp.*, 278 F.3d 401, 406 (4th Cir. 2002); Fed. R. Civ. P. 57 ("These rules govern the procedure for obtaining a declaratory judgment…."). The Court views the factual allegations in the light most favorable to the non-moving party. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). When the plaintiff moves, the Court accepts the allegations in the complaint to the extent they do not conflict with the answer. *Id.*

In this case, there is no dispute about the content of the two severance agreements, which claim to "waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding." (*See* Stirnweis, Answer, ECF No. 5, at ¶¶ 61, 63; Hutchens, Answer, ECF No. 5, at ¶¶ 64, 93-94; Hutchens, Compl., Ex. 1; Curwod Decl., Ex. 1.) Although Stirnweis' severance agreement was not attached to her complaint, on a motion for judgment on the pleadings, the Court "may consider documents . . . attached to the motion . . . so long as they are integral to the complaint and authentic." *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Walker v. Kelly*, 589 F.3d 127, 138 (4th Cir. 2009). There is no dispute between the parties here as to the substance or authenticity of the relevant agreements.

II.    **Waivers of Federal Rights that Thwart the Statutory Purpose Are Void as Against Public Policy.**

Under well-established principles of law, Plaintiffs cannot waive their federal right to proceed on a collective basis if the waiver of such right contravenes congressional policy.

Bedrock contract-law principles state that agreements that violate public policy are void and unenforceable. *See, e.g.*, *Woodstock Iron Co. v. Richmond & D. Extension Co.*, 129 U.S. 643, 662 (1889). This rule has been in place for more than a century and has been adopted in jurisdictions throughout the United States. *See id*; Restatement (Second) of Contracts § 178 (1981).

The rule prohibiting the enforcement of contracts that contravene public policy takes on special force when applied to agreements that attempt to waive federal statutory rights. The seminal case on the subject, *O'Neil*, 324 U.S. 697, concerns the right to liquidated damages under the Section 216(b) of the FLSA—the very same provision at issue here. In *O'Neil*, the Supreme Court held that "a statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy." 324 U.S. at 704. "Where a private right is granted in the public interest to effectuate a legislative policy, waiver of a right so charged or colored with the public interest will not be allowed where it would thwart the legislative policy which it was designed to effectuate." *Id.*; *accord Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 740 (1981); *Taylor v. Progress Energy, Inc.*, 493 F.3d 454, 460 (4th Cir. 2007). "With respect to private rights created by a federal statute, such as Section 16(b)," the "controlling question" is whether "the intention of Congress as manifested in the particular statute" allows for waiver of the right. *O'Neil*, 324 U.S. at 705. In the absence of evidence of specific intent, courts must engage in a "broader consideration of the legislative policy behind the provision as evidenced by its legislative history and the provisions in and structure of the Act." *Id.* at 705-06.

Accordingly, a waiver of a federal statutory right is void under federal law if the following elements are met: 1) the right is conferred on a private party; 2) the right affects the public interest; and 3) waiver contravenes the legislative policy as reflected in the text, legislative history, and structure of the statute. *Id.* at 704-06.

### III.   Waivers of Collective-Action Rights Thwart the Legislative Policy Underlying the FLSA.

Stirnweis could not waive her collective-action and joinder rights under the FLSA through the Letter of Agreement. The text, structure, and legislative history of Section 16(b) of the FLSA demonstrate that waiver of the right for litigants to proceed collectively would thwart the legislative policy underlying the statute.

Section 16(b) states: "An action to recover the liability prescribed in the preceding sentences may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).

In this provision, "Congress has stated its policy that . . . plaintiffs should have the opportunity to proceed collectively." *Hoffmann-La Roche Inc. v. Sperling*, 493 U.S. 165, 170 (1989). The right to proceed collectively is granted to a private party—here, the "employee[]." 29 U.S.C. § 216 (b). Congress intended collective actions to promote the public interest and that allowing litigants to waive this provision thwarts that intended policy. *See O'Neil*, 324 U.S. at 705.

### A.   The FLSA Broadly Protects Workers from Substandard Working Conditions, and Those Protections Cannot Be Waived by Private Contract.

"The central purpose of FLSA," passed by Congress in 1938, "is to achieve certain minimum labor standards for covered employees." *Ball v. Memphis Bar-B-Q Co., Inc.*, 228 F.3d 360, 366 (4th Cir. 2000) (citing 29 U.S.C. § 202; *Mitchell v. Robert De Mario Jewelry, Inc.*, 361 U.S. 288, 292 (1960)). The Act provides for the payment of a minimum wage, requires increased pay for overtime, and outlaws oppressive child labor. *See* 29 U.S.C. §§ 206, 207, 212. These provisions reflect Congress' intent to "protect certain groups of the population from substandard wages and excessive hours which endangered the national health and well-being and the free flow of goods in interstate commerce." *O'Neil*, 324 U.S. at 706-07.

The FLSA's core minimum wage, overtime, and child labor requirements were explicitly crafted to prevent employers and employees from contracting for less. "The statute was a recognition of the fact that due to the unequal bargaining power as between employer and

employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce." *Id.* For these reasons, courts have adopted a general policy that the FLSA rights of employees "cannot be abridged by contract or otherwise waived because this would nullify the purposes of the statute and thwart the legislative policies it was designed to effectuate." *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 199 (4th Cir. 2005) (quoting *Barrentine*, 450 U.S. at 740); *Brockman v. Keystone Newport News, LLC*, No. 4:15-CV-74, 2018 WL 4956514, at *2 (E.D. Va. Oct. 12, 2018) (noting the "general policy" against waiver of "FLSA rights"). "[T]he same policy which forbids employee waiver of the minimum statutory rate because of inequality of bargaining power, prohibits these same employees from bargaining with their employer" to settle FLSA claims outside the supervision of an appropriate forum. *D.A. Schulte*, 328 U.S. at 115 (quoting *O'Neil*, 324 U.S. at 708).

    **B.**    **The History of the FLSA's Collective Action Mechanism Supports the Conclusion that Waiver Frustrates the Public Policy Underlying the Collective-Action Provision.**

Congress sought to enforce the FLSA's core minimum wage, overtime, and child labor requirements by providing the right to employees to challenge illegal practices collectively. And waiver of collective-action rights interferes with the public policies underlying the FLSA generally and the collective-action mechanism specifically.

Under the original version of Section 16(b), a claim could be brought "by any one or more employees for and on behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated." FLSA, Ch. 676, § 16(b), 52 Stat. 1060, 1069 (1938). As the Supreme Court has recognized, collective actions promote Congress' policy of ensuring uniform minimum-pay standards by "lower[ing] individual costs to vindicate rights by the pooling of resources," thereby incentivizing employees to vindicate their rights, and easing the burdens and costs on the courts by encouraging "efficient resolution in one proceeding." *See Hoffmann-La Roche*, 493 U.S. at 170.

The FLSA's drafting history demonstrates that these concerns were at the forefront of Congress' decision to enact Section 16(b). The principal reference to Section 16(b) in the congressional debates was by Representative Keller, who stated that the provision was "a common-sense and economical method of regulation" that "puts directly into the hands of the employees . . . the means and ability to assert and enforce their rights," thereby ensuring they "will not suffer the burden of an expensive lawsuit" while "minimizing the cost of enforcement by the Government." *O'Neil*, 324 U.S. at 706 n.16 (quoting 83 Cong. Rec. 9,264 (1938)).

House and Senate committee hearings further emphasize these two interrelated concerns. The right to bring a representative action, and the "similarly situated" language, was suggested by John Keating, a testifying expert, who stated that simply permitting an employee to sue was "not sufficiently broad." Joint Hearings Before the S. Comm. on Educ. & Labor and the H. Comm. on Labor on S. 2475 and H.R. 7200, 75th Cong., at 457 (1937). He asked, "[W]hat would happen if a thousand employees of one [employer] had to file a thousand separate suits[?] It just would not be done. The [employer] would *know* it would not be done." *Id.* He opined that the collective-action mechanism was necessary to incentivize private enforcement to ensure compliance with the FLSA. *Id.*

The Chairman of the House Committee on Labor William Connery, who introduced the bill in the House, then expressed concerns about the "multifariousness" of potential lawsuits where an employer has engaged in broadscale violations, echoing reservations over what would happen if "a thousand men" brought suit. *Id.* at 461. Keating assured Chairman Connery that this was the very situation the collective-action mechanism was designed to address. *Id.* Congress accordingly enacted this recommendation into law. *See* FLSA, Ch. 676, § 16(b), 52 Stat. 1060, 1069 (1938).

The Portal-to-Portal Act of 1947, Pub. L. No. 80-49, 61 Stat. 84 (1947), which amended the FLSA to eliminate "representative actions" brought by employees' agents and instead provided for the current opt-in system, did not alter Congress' statutory policies underlying collective actions. The amendment was a response "to excessive litigation spawned by plaintiffs lacking a personal interest in the outcome." *Hoffmann-La Roche Inc.*, 493 U.S. at 173. Committee reports

emphasize that collective actions "may continue to be brought . . . in accordance with the existing provisions of the" FLSA by "a real party in interest." H.R. Rep. No. 80-326, at 13 (1947) (Conf. Rep.); *see also* S. Rep. No. 80- 37, at 48; S. Rep. No. 80-48, at 49. As Representative Samuel Hobbs explained, "The only thing we are after by that provision [amending Section 16(b)] is the unauthorized suing for people who do not want it done." 93 Cong. Rec. 1,560 (1947); *see also* 93 Cong. Rec. 2289 (1947) (statement of Senator Patrick McCarran) (noting that the bill "would have the effect of eliminating representative actions, while maintaining authority for collective actions"). The FLSA's original "similarly situated" language has remained in place unchanged for more than eighty years, reaffirming Congress' continued commitment to collective actions as a means of ensuring effective enforcement of the FLSA. Indeed, the legislative history of the Portal-to-Portal Act shows that it was designed to further the very same policy considerations underlying the original collective-action provision by striking a careful balance that allows for the effective and efficient vindication of claims while preventing courts from being bombarded with an excessive number of lawsuits.

### C. Collective Action Waivers Violate the Congressional Policies Animating the FLSA Generally and Section 16(b) Specifically.

Collective action waivers, like the one Capital One seeks to enforce here, violate the policies underlying the FLSA generally and the FLSA's collective action mechanism specifically.

As the Sixth Circuit has held, allowing waiver of FLSA collective-action rights would impede the congressional objectives underlying the FLSA. *See Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 590-92 (6th Cir. 2014). As part of its minimum-wage and overtime protections, the FLSA provides procedures for procuring relief in court, including the option to pursue a collective action. *See* 29 U.S.C. § 216(b). "Collective actions are crucial for effective enforcement of the FLSA." Douglas D. Scherer & Robert Belton, *Symposium, Introduction: Class and Collective Actions in Employment Law*, 10 Emp. Rts. & Emp. Pol'y J. 351, 351 (2006). "[I]n cases where each individual claim is small, having to litigate on an individual basis would likely discourage the employee from bringing a claim for overtime wages." *Killion*, 761 F.3d at 592. An employer

11

thereby gains an advantage over its competitors and circumvents full enforcement of the FLSA's wage and overtime requirements. *Killion*, 761 F.3d at 591. This ability of employers to gain a competitive advantage frustrates Congress' policy of ensuring uniform minimum-pay standards. *Id.*; *O'Neil*, 324 U.S. at 710.

Moreover, allowing waiver of collective-action rights in cases where plaintiffs bring their claim in court would undermine the statutory policies Congress intended to implement when it enacted the Section 16(b). "As a general proposition, litigation is expensive and burdensome." *V & S Vin & Sprit Aktiebolag v. Hanson*, 146 F. Supp. 2d 796, 801 (E.D. Va. 2001). Indeed, the waiver at issue here prohibits not only collective actions, but also joinder or any other "multi-party" actions. (Hutchens, Compl. Ex. 1, ECF No. 1-1; Curwood Decl., Ex. 1.) Without the ability to pool resources, individuals with small claims are much less likely to pursue them through an "expensive lawsuit," resulting in a lack of private enforcement—a crucial policy concern for Congress. *See O'Neil*, 324 U.S. at 706 n.16 (quoting 83 Cong. Rec. 9,264 (1938)). Those most likely to be deterred are the most vulnerable individuals—employees who have low wages and cannot afford to front the costs of litigation. And in those cases where employers' violations have resulted in significant, widespread damages to professional, highly-payed employees, the aggrieved employees will bombard the courts with lawsuits—implicating another of Congress' key policy concerns. Joint Hearings Before the S. Comm. on Educ. & Labor and the H. Comm. on Labor on S. 2475 and H.R. 7200, 75th Cong., at 461 (1937).

Importantly, the analysis does not depend on whether Stirnweis and Hutchens, specifically, lack incentives to file their claims individually or plan to file multifarious suits. The test under *O'Neil* is not so limited, but rather is designed to ensure the uniform implementation of Congress' statutory policies affecting the interest of the public as a whole. The question under *O'Neil* is not one of unconscionability as to the particular employee. Rather, the issue is the *public* interest and whether allowing waiver, as a matter of policy, violates Congress' purposes. 324 U.S. at 704-06. As explained above, collective-action waivers by litigants interfere with the statutory policies of Congress by encouraging judicial inefficiency, creating additional costs and burdens in litigation,

increasing the burden on the government in public enforcement, and reducing the potential number of employees who will complain about illegal conduct in the first place, allowing employers to retain the benefits reaped from unlawful conduct.

**D.    The Text and Structure of Section 16(b) Illustrate that the Right to Bring a Collective Action and the Right to Bring an Action in a Judicial Forum Are Inextricably Intertwined.**

The placement and structure of the collective-action clause within the FLSA further demonstrates that litigants cannot waive their collective-action rights.

When a provision qualifies or limits a statutory right within the very same section, principles of statutory construction suggest that it "goes to the right created, and accompanies the obligation everywhere." *Davis v. Mills*, 194 U.S. 451, 454 (1904). Here, the fact that the FLSA's collective-action right is contained within the same chapter as the FLSA's core substantive provisions suggests that Congress viewed the collective action as essential to the effective vindication of the FLSA.

Moreover, Congress' decision to place the collective action right in the same sentence permitting suits in federal or state court indicates that the two provisions are intertwined and inseparable. In a single sentence, Section 16(b) provides: "An action to recover the liability prescribed in the preceding sentences may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C § 216(b).

The term "by any one or more employees" modifies the verb "maintained"—thereby connecting the right to joinder to the right to bring an "action" in "Federal or State court." *Id.* The collective-action right, in turn, is part of an adverbial prepositional phrase that modifies the act of maintaining such an action in federal or state court. *Id.* By granting the right to a judicial forum, the right to joinder, and the collective-action mechanism in the same breath, Congress has created a natural association between these rights that prevents them from being divorced from one another. "A statute must be construed as 'mandated by the grammatical structure.'" *Resolution Tr. Corp. v. Love*, 36 F.3d 972, 976 (10th Cir. 1994) (citing *United States v. Ron Pair Enter.*, 489 U.S.

235, 241 (1989)). Phrases within the same sentence should not be read in isolation. *Julian v. Rigney*, No. 4:13-CV-00054, 2014 WL 4053361, at *5 (W.D. Va. Aug. 15, 2014), *aff'd sub nom. Julian v. U.S. Dep't of Agric.*, 585 F. App'x 850 (4th Cir. 2014).

Applying these rules of construction, the collective-action mechanism, and the right to join multiple plaintiffs, "goes to" the right to sue in court, and "accompanies [it] everywhere." *Davis*, 194 U.S. at 454. In Section 16(b) Congress has expressly mandated the procedures available to litigants who pursue their rights in court. *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1626 (2018) (noting that "when Congress wants to mandate particular dispute resolution procedures it knows exactly how to do so" and citing Section 16(b) as an example). That Congress chose to intertwine the right to joinder or to pursue or participate in a collective action with the right to a judicial forum is not mere happenstance; it illuminates the congressional intent underlying the FLSA as a whole, and the litigation-related policy concerns the collective-action mechanism was designed to address. *See supra* at 8-12.

Congress' explicit use of a statutory collective action mechanism in the FLSA stands in contrast, of course, to the numerous federal statutes that contain no such provision. Private actions arising under these statutes may potentially be brought as class actions under Rule 23 of the Federal Rules of Civil Procedure. But Rule 23 is unlikely to be held essential to vindicating any particular statutory right. *See* Rules Enabling Act, 28 U.S.C. § 2072 (providing that the Supreme Court's rules "shall not abridge, enlarge or modify any substantive right"). Where, on the other hand, Congress specifically provides, within the same statute, a right to group actions for pursuing violations, it strongly suggests that Congress viewed the right to proceed as a group as essential to vindicating that statute's core substantive rights. *See Davis*, 194 U.S. at 454. Here Congress has done so. Accordingly, the right for court litigants to join multiple plaintiffs and pursue a collective action is non-waivable.

## IV.  Waivers of Collective-Action Rights Contravene the Legislative Policy Underlying the ADEA.

The contractual provision claiming to waive the collective-action and joinder rights in

Hutchens' Letter of Agreement is equally unenforceable. The text, structure, and legislative history of the ADEA and subsequent amendments, including Congress' incorporation of FLSA Section 16(b) into the ADEA, demonstrate that waiver of the right for ADEA litigants to proceed collectively would contravene congressional intent and frustrate the legislative policies underlying the statute.

### A.    The ADEA's Hybrid Enforcement Scheme Incorporates the FLSA's Prohibition Against Waiver of Collective-Action Rights.

Enacted in 1967, the ADEA Section 4 bars age discrimination in employment. *See* 29 U.S.C. § 623. The preamble to the ADEA emphasizes the social costs of age discrimination, noting that "the setting of arbitrary age limits regardless of potential for job performance has become a common practice." 29 U.S.C. § 621(a)(2). Congress further stated that age discrimination "burdens commerce and the free flow of goods in commerce." *Id.* § 621(a)(4). The purpose of the ADEA was to address these concerns, "promote employment of older persons based on their ability rather than age," and "help employers and workers find ways of meeting problems arising from the impact of age on employment." *Id.* § 621(b).

The ADEA was the result of extensive fact-finding by the Secretary of Labor under the direction of Congress, culminating in a report by the Secretary of Labor that highlighted the harms of age discrimination. *See EEOC v. Wyoming*, 460 U.S. 226, 229-31 (1983). The report's findings, later affirmed by Congress, included, among other things, the conclusion that "[m]any employers adopted specific age limitations" and that "[i]n the aggregate, these age limitations had a marked effect upon the employment of older workers." *Id.* (citing Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment (1965)). The Report concluded that these harms could be corrected through a "well administered and *well enforced* statute." Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment, 21-22 (1965), *available at* http://bit.ly/2s8ZCY2 (emphasis added).

To ensure that the ADEA was "well enforced," "Congress created an enforcement scheme which is 'something of a hybrid.'" *Equal Employment Opportunity Comm'n v. Gilbarco, Inc.*, 615

F.2d 985, 987 (4th Cir. 1980) (quoting *Lorillard v. Pons*, 434 U.S. 575, 578 (1978)). The ADEA borrows most of the enforcement provisions of the FLSA, including the provisions of FLSA Section 16, 29 U.S.C. § 216(b). Section 7(b) of the ADEA provides: "The provisions of this chapter shall be enforced in accordance with the powers, remedies, and procedures provided in sections 211(b), 216 (except for subsection (a) thereof), and 217 of this title, and subsection (c) of this section." 29 U.S.C. § 626(b). Section 7(b) further mandates that "[a]mounts owing to a person as a result of a violation of [the ADEA] shall be deemed to be unpaid minimum wages or unpaid compensation for purposes of sections 216 and 217 of this title." *Id.*

Thus, judicial enforcement of the ADEA is "generally governed by the enforcement provisions of the [FLSA], with some modifications." *Id.* at 987-88. "[I]n enacting the ADEA, Congress exhibited both a detailed knowledge of the FLSA provisions and their judicial interpretation and a willingness to depart from those provisions regarded as undesirable or inappropriate for incorporation." *Lorillard*, 434 U.S. at 581. The "selectivity that Congress exhibited in incorporating provisions and in modifying certain FLSA practices strongly suggests that but for those changes Congress expressly made, it intended to incorporate fully the remedies and procedures of the FLSA." *Id.* at 583; *accord Gilbarco*, 615 F.2d at 989.

This history suggests that the Congress that enacted the ADEA believed the FLSA's collective-action mechanism was a critical tool to enforce the statute and that it was good policy to incorporate it into the ADEA. The incorporation of Section 16(b) shows that the ADEA-enacting Congress, like the FLSA-enacting Congress, viewed enforcement as a crucial concern. *See* Report of the Secretary of Labor, The Older American Worker: Age Discrimination in Employment, 21-22 (1965), *available at* http://bit.ly/2s8ZCY2. Accordingly, the same policies underlying the adoption of collective actions for the FLSA apply to the ADEA. In *Hoffman-LaRoche*, the Supreme Court confirmed this, discussing the importance of collective actions to the ADEA's statutory framework and the importance of allowing courts to manage the joinder of multiple parties in an ADEA action. 493 U.S. 165. "The ADEA, through incorporation of § 16(b), expressly authorizes employees to bring collective age discrimination actions 'in behalf of ...

themselves and other employees similarly situated.'" *Id.* at 171. "Congress has stated its policy that ADEA plaintiffs should have the opportunity to proceed collectively." *Id.* "[T]he collective form of action is designed to serve the important function of preventing age discrimination . . . ." *Id.* "A collective action allows age discrimination plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged discriminatory activity." *Id.* "It follows that, once an ADEA action is filed, the court has a managerial responsibility to oversee the joinder of additional parties to assure that the task is accomplished in an efficient and proper way." *Id.* at 170-71.

Lowering litigation costs through the pooling of resources and achieving judicial efficiency are the very same goals Congress hoped to achieve in providing for collective actions in the FLSA. *See supra* at 9-13. The collective-action and joinder rights cannot be waived by an ADEA claimant any more than by a FLSA claimant, for the same reasons. *See supra* at 11-14; *Equal Employment Opportunity Comm'n v. Baltimore Cty.*, 904 F.3d 330, 335 (4th Cir. 2018) (explaining that the ADEA's "legislative history . . . suggests that Congress consciously chose to incorporate the powers, remedies, and procedures of the FLSA into the ADEA" and acted "with particular precision in crafting the statute"). Any such waiver would thwart Congress' policy of incentivizing private litigation, promoting efficiency in the court system, and achieving a balance that assures effective enforcement while avoiding a flood of individual litigation.

**B.    Waiver Thwarts the Policies of Congress as Reflected in the OWBPA.**

The same legislative policy concerns preventing waiver of collective-action rights in the FLSA are reflected in amendments to the ADEA and further preclude waiver of Hutchens' collective-action rights here.

Enacted in 1990, the OWBPA amended the ADEA to impose certain "mandatory requirements for waivers of ADEA rights and claims." *Syverson v. Int'l Bus. Machines Corp.*, 472 F.3d 1072, 1075-76 (9th Cir. 2007). The goal of the OWBPA was to "protect the rights and benefits of older workers," and ensure that "older workers are not coerced or manipulated into waiving

their rights to seek legal relief under the ADEA." S. Rep. No. 101-263, at 5 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 1509, 1510. Under the OWBPA, an employee may not waive "any right or claim" under the ADEA unless the employer complies with the statute's requirements. 29 U.S.C. § 626(f); *Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 427 (1998). These include special timing requirements and notice provisions whenever a waiver is requested in connection with "an exit incentive or other employment termination program offered to a *group or class* of employees." 29 U.S.C. § 626(f)(1)(F)-(G).

"The OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and [courts] are bound to take Congress at its word." *Oubre*, 522 U.S. at 427. Because Capital One failed to comply with the provisions of the OWBPA (Compl. ¶¶ 67-75), Hutchens and any other employees who signed collective-action waivers in their severance agreements may pursue their ADEA rights in court. *See Oubre*, 522 U.S. at 427 ("An employee may not waive an ADEA claim unless the employer complies with the OWBPA.").

The OWBPA's proscription against waivers of "any right or claim" is sweeping and broad enough to cover the right to bring a collective action when an ADEA claim is brough in a judicial forum. The plain text of the OWBPA reflects a concern for large-scale terminations of a "group or class" or employees—groups that would obviously benefit most accurately from collective actions. *See* 29 U.S.C. § 626(f)(1)(F)-(G). The legislative history of the OWBPA highlights these concerns: "Group termination and reduction programs stand in stark contrast to the individual separation. During the past decade, in particular, employers faced with the need to reduce workforce size have resorted to standardized programs designed to effectuate quick and wholesale reductions." S. Rep. No. 101-263, *reprinted in* 1990 U.S.C.C.A.N. 1509, 1537-38. Clearly, through the OWBPA, Congress intended to provide employees who are terminated as part of a standardized program affecting a group or class of employees the means of effectively vindicating their rights. As explained above, that is exactly what ADEA collective actions do, too. *See supra* at 8-13. Allowing employers to interfere with this framework by including waivers as part of a severance agreement would subvert Congress' intent in enacting the OWBPA.

The OWBPA expressly precludes waiver of collective-action rights, but even if it did not, Congress' policy against waiver and concerns about large-scale layoffs under standardized programs, as reflected in the OWBPA's text and legislative history, bolster a finding that waiver frustrates the statutory policies underlying the ADEA as a whole and is therefore precluded under *O'Neil* and its progeny.

## V.    Collective-Action Waivers Are Void as Against Statutory Policy for Both ADEA and FLSA Claims.

As explained above, a waiver of the right to proceed collectively in court is void as against public-policy regardless of whether the employee brings a claim under the FLSA or the ADEA. The ADEA not only fully incorporates the FLSA's collective-action right, but also mandates that ADEA damages shall be treated the same as unpaid minimum wages or unpaid compensation under the FLSA. *See* 29 U.S.C. § 626(b). This reflects Congress' intent that the FLSA's enforcement framework apply to the ADEA. *See Lorillard*, 434 U.S. at 583. The arguments about Section 16(b)'s legislative history, purposes, and structure apply with full force to both the ADEA and the FLSA. Furthermore, in both the ADEA and the FLSA and amendments thereto, Congress expressed concerns about enforcement for large-scale violations by employers against numerous, similarly situated employees. *Compare* 29 U.S.C. § 626(f)(1)(F)-(G) *and* S. Rep. No. 101-263, reprinted in 1990 U.S.C.C.A.N. 1509, 1537-38, *with* Joint Hearings Before the S. Comm. on Educ. & Labor and the H. Comm. on Labor on S. 2475 and H.R. 7200, 75th Cong., at 457 (1937) (statements of John Keating and Rep. William Connery). The collective-action mechanism was designed to answer these concerns.

The only significant analytical difference between Stirnweis' and Hutchens' waivers is that the OWBPA provides an independent basis to conclude that Hutchens' waiver is unenforceable. But this distinction ultimately does not lead to different results for Stirnweis and Hutchens. As explained above, the OWBPA does not supplant other grounds for waiver, such as public-policy grounds. *See Griffin*, 62 F.3d at 373; *Bennett*, 189 F.3d at 1229. It makes no practical difference,

19

then, whether the Court finds prohibition against waiver under the plain text of the OWBPA or under the rule articulated in *O'Neil*, 324 U.S. at 704.

Accordingly, the analysis, which looks to the statutory policies underlying the particular statute, as expressed in the legislative history, the structure, and the intent of Congress, is materially identical for ADEA and FLSA plaintiffs. Neither Stirnweis nor Hutchens' waivers are enforceable.

## VI. Cases Allowing Waiver of Collective-Action Rights in Arbitration Agreements Are Inapposite and Distinguishable.

In a series of cases, the Supreme Court and the courts of appeals have held that the right to proceed as a collective under Section 16(b) can be waived in the context of an arbitration agreement. *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 258 (2009); *Gilmer v. Interestate/Johnson Lane Corp.*, 500 U.S. 20, 26-27 (1991); *Adkins v. Labor Ready, Inc.,* 303 F.3d 496, 503 (4th Cir. 2002); *see also Killion*, 761 F.3d at 591 (citing cases from other circuits and finding them unpersuasive outside the arbitration context). These cases are inapplicable here. They employ a different analysis due to the mandate of other, earlier-enacted federal statutes (the FAA and the NLRA) that contain their own statutory policies. And statutes requiring arbitration tend to align with the policies underlying the FLSA and ADEA: swapping the efficiency of a collective action for the efficiency of arbitration. Outside the context of arbitration, however, collective action waivers dramatically undermine the congressional policies animating the FLSA and ADEA, and cannot be enforced. *See Killion*, 761 F.3d at 591.

### A. This Case Requires a Different Analysis, Inapplicable to Arbitration Cases.

The arbitration cases involve an analysis and reconciliation of policy concerns in the FLSA and ADEA with the legislative policies of prior-enacted federal statutes. Here, the only relevant statutory policies are Congress' policies in enacting the ADEA, the FLSA, and their amendments. As courts have recognized, "the considerations change when an arbitration clause is involved." *See id.*

It is a fundamental axiom of law that modifications of statutes by subsequent congressional enactments are justified only when the two statutes are otherwise irreconcilable. *Morton v. Mancari,* 417 U.S. 535, 550 (1974); *United States v. Welden,* 377 U.S. 95, 103 n.12 (1964); *United States v. Borden Co.,* 308 U.S. 188, 198-199 (1939). To be considered "irreconcilable," the subsequent statute must be "certainly and clearly in hostility to the former." *State of South Carolina v. Stoll*, 84 U.S. 425, 431 (1873).

Cases involving arbitration agreements fall within the purview of the FAA, and that makes all the difference. The FAA establishes "a liberal federal policy favoring arbitration agreements" which requires courts "to enforce agreements to arbitrate according to their terms." *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)). This is true "even when the claims at issue are federal statutory claims, unless the FAA's mandate has been 'overridden by a contrary congressional command.'" *Id.* (quoting *Shearson/American Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). This "contrary congressional command" must be "explicit[]," and "specific"—meaning it generally must address the arbitration issue directly. *E.g.*, *Epic Sys.*, 138 S. Ct. at 1624, 1627 (explaining that Congress must offer "specific" guidance if it wishes to suspend the operation of the FAA in a later statute); *Gilmer*, 500 U.S. at 29 ("Congress, however, did not explicitly preclude arbitration or other nonjudicial resolution of claims, even in its recent amendments to the ADEA.").

The reason that courts are wont to void arbitration agreements on public-policy grounds is straightforward. In the arbitration cases, finding waiver void on grounds of public-policy is "dangerous" because public policy is a "two-edged sword." *Westvaco Corp. v. United Paperworkers Int'l Union, AFL-CIO ex rel. Local Union 676*, 171 F.3d 971, 977 (4th Cir. 1999) (discussing the public policies underlying the NLRA). In arbitration cases, courts must consider not only the congressional policy behind the waived federal rights, but also the "countervailing federal policy" of the FAA. *Killion*, 761 F.3d at 592. It will only void the waiver on public-policy

grounds if the subsequent statutory policy is "irreconcilable" with the FAA's. *Epic Sys.*, 138 S. Ct. at 1624.

There is no question that collective-action rights generally can be waived in an arbitration agreement. *See generally Epic Sys.*, 138 S. Ct. 1612; *Gilmer*, 500 U.S. 20. The reasons for that are two-fold. First, arbitration agreements—including *with whom* a party will arbitrate—are enforced according to their terms pursuant to the FAA, and arbitration agreements are presumed to be bilateral unless they expressly allow for class procedures. *See, e.g.*, *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683 (2010). As the Supreme Court explained in *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 347-52 (2011), class or collective actions tend to frustrate the principal goals of arbitration: its informality, efficiency, and willingness to trade many procedural protections for quick and inexpensive resolution of disputes. *Id.* at 348-50. But any policy favoring bilateral dispute resolution is inapplicable here, given that there is no arbitration agreement and that collective litigation is expressly provided for in the relevant statute. *See* 29 U.S.C. §§ 216(b), 626(b). Where "no arbitration agreement is present…[there is] no countervailing federal policy that outweighs the policy articulated in the FLSA." *Killion*, 761 F.3d at 592.

Second, arbitration by its very nature trades court procedures for private ones. "By agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute . . . . It only trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985). Through the FAA, Congress has established a federal policy favoring this trade-off. *See* 9 U.S.C. §§ 1-16. Thus, in the arbitration context, procedural rights are typically found waivable, while substantive rights are not, because that generally accords with the policies expressed by Congress in the competing statutes. *See id.*; *Gilmer*, 500 U.S. at 26. This is merely a guideline, however. Waivers of procedural rights can still be void on public-policy grounds even in the arbitration context. *See Mitsubishi*, 473 U.S. at 637 n.19 (noting circumstances where procedural waivers would be void "as against public policy" even in the arbitration context); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 334 (4th Cir. 2017) (same); *see also, e.g.*, *Boyd*,

338 U.S. at 264 (holding that the Federal Employers' Liability Act forum-selection clause is non-waivable); *Aaacon Auto Transp., Inc. v. State Farm Mut. Auto. Ins. Co.*, 537 F.2d 648, 654 (2d Cir. 1976) (holding that the forum-selection clause of the Carmack Amendment to the Hepburn Act is non-waivable).

This substantive-procedural distinction, however, is wholly inapplicable outside of the arbitration context, where the purpose for which it was drawn does not apply. The only relevant question in cases not involving arbitration is whether the contractual provision at issue, whether labeled procedural or substantive, contravenes public policy. Outside the arbitration context, courts have invalidated various types of contractual provisions because they contravened public policy, including statutory rights that could be described as "substantive," "procedural," or both. *See Boaz*, 725 F.3d at 606 (citing *Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988)) (explaining that "the distinction between procedural and substantive rights is notoriously elusive"). Rights found to be non-waivable include:

- The right to bring a collective action under 29 U.S.C. § 216(b)—the very right at issue in this case. *Killion*, 761 F.3d at 590.

- FLSA rights generally, including the right to minimum wage and overtime pay. *Barrentine*, 450 U.S. at 740; *Kuntze v. Josh Enterprises, Inc.*, No. 2:18CV38, 2019 WL 2179220, at *1 (E.D. Va. May 20, 2019); *Bertrand v. Children's Home*, 489 F. Supp. 2d 516, 521 (D. Md. 2007).

- Liquidated damages under 29 U.S.C § 216(b). *O'Neil*, 324 U.S. 697.

- Forum- and venue-selection clauses. *E.g.*, *Boyd v. Grand Trunk W. R. Co.*, 338 U.S. 263, 264 (1949) (Federal Employers' Liability Act forum-selection clause); *Aaacon Auto Transp., Inc. v. State Farm Mut. Auto. Ins. Co.*, 537 F.2d 648, 654 (2d Cir. 1976) (the forum-selection clause of the Carmack Amendment to the Hepburn Act); *Dumont v. PepsiCo, Inc.*, 192 F. Supp. 3d 209, 220 (D. Me. 2016) (ERISA's choice-of-venue clause); *Nunez v. Am. Seafoods*, 52 P.3d 720, 723 (Alaska 2002) (Jones Act's forum-selection clause).

23

- Statutes of limitations. *E.g.*, *Logan v. MGM Grand Detroit Casino*, 939 F.3d 824, 829 (6th Cir. 2019) (Title VII); *Boaz v. FedEx Customer Information Services, Inc.*, 725 F.3d 603 (6th Cir. 2013) (FLSA and the Equal Protection Act); *Castellanos v. Raymours Furniture Co., Inc.*, 291 F. Supp. 3d 294, 298 (E.D.N.Y. 2018) (FLSA).

- A statutory right to attorney's fees. *See In re: Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18MD2836, 2018 WL 4677830, at *9 (E.D. Va. Sept. 6, 2018), *report and recommendation adopted in full sub nom. In re Zetia (Ezetimibe) Antitrust Litig.*, No. 2:18MD2836, 2018 WL 6795836 (E.D. Va. Dec. 6, 2018).

- Notice provisions of the Truth-in-Leasing Regulations. *Al-Anazi v. Bill Thompson Transp., Inc.*, No. 15-CV-12928, 2016 WL 3611886, at *7 (E.D. Mich. July 6, 2016).

As these cases demonstrate, outside the context of arbitration, the key question is whether allowing waiver of the particular right thwarts the public policy Congress intended to implement in the particular statute. The character of the right as procedural or substantive is not dispositive. *Boaz*, 725 F.3d at 606 ("The caselaw recognizes no such distinction."); *see also Sun Oil Co. v. Wortman*, 486 U.S. 717, 726 (1988) (explaining that the line between substantive and procedural rights is blurry).

Moreover, requiring individualized *court proceedings* undermines the congressional policies embodied in the FLSA and ADEA in a way that requiring individualized *arbitration proceedings* does not. The arbitration cases do understandably raise the following question: if waiver of the collective-action right in an arbitration agreement can be reconciled with the FLSA and ADEA's policies, then how is it possible that waiver of the right to pursue a collective-action in a *court proceeding* cannot? The answer lies in the alignment of the policies underlying the FAA and the collective-action provision. The collective-action mechanism is designed to allow the pooling of resources to lower the costs of litigation and incentivize the vindication of FLSA and ADEA rights, even for claims of small pecuniary value. *Hoffmann-La Roche*, 493 U.S. at 170; *supra* at 8-13. The FAA is designed to achieve the very same policy goals. "The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined"

24

resolution of disputes. *Concepcion*, 563 U.S. 333, 344. A such, "arbitration agreements allow parties to avoid the costs of litigation, a benefit that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts." *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 123 (2001); *see also Penn Plaza*, 556 U.S. at 257 ("Parties generally favor arbitration precisely because of the economics of dispute resolution."). The FLSA and ADEA collective action mechanism was also intended to ease the burdens and costs on the courts by creating efficiency in the judicial system. *Hoffman-La Roche*, 493 U.S. at 170; *supra* at 9, 12. The FAA also promotes these policies by removing disputes from the judicial system altogether. *See McCabe v. State Farm Mut. Auto. Ins. Co.*, 36 F. Supp. 2d 666, 673 (E.D. Pa.) (noting "the importance of arbitration in lessening the burden on the judicial system"), *aff'd,* 205 F.3d 1329 (3d Cir. 1999).

And by forcing employees into individualized court proceedings without conferring any of the benefits of arbitration, collective action waivers effectively undermine the core substantive protections of the FLSA and ADEA. Such waivers operate to "discourage[] the employee from bringing a claim," which is tantamount, from the employer's perspective, of "having its employees waive their rights...to minimum wages, overtime, or liquidated damages." *Killion*, 761 F.3d at 590-92.

The same analysis applies in the context of arbitration provisions in collective bargaining agreements. *See, e.g.*, *Penn Plaza*, 556 U.S. 247. "Arbitration of labor disputes under collective bargaining agreements is part and parcel of the collective bargaining process itself." *Steelworkers v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960). The NLRA and the Labor Management Relations Act establish a statutory framework for collective bargaining to further the very same goals and policies as the collective action (and the FAA). These collective-bargaining statutes are "[p]redicated on the assumption that individual workers have little, if any, bargaining power, and that 'by pooling their economic strength and acting through a labor organization . . . the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions." *Barrentine*, 450 U.S. at 735. The collective-bargaining statutes

"reflect Congress' determination that to improve the economic well-being of workers, and thus to promote industrial peace, the interests of some employees in a bargaining unit may have to be subordinated to the collective interests of a majority of their co-workers." *Id.* By allowing for the pooling of resources and removing disputes from courtrooms, collective bargaining for private dispute-resolution procedures serves the same functions as Section 16(b)'s collective action— relieving the burden on the judiciary and incentivizing enforcement by lowering the costs for claimants to vindicate their rights.

Given that arbitration was designed to further many of the same public-policy goals as collective actions, it is no surprise that courts have found no "irreconcilable" conflict between the policies of the FAA or the collective-bargaining statutes on the one hand, and the policies of the ADEA or FLSA on the other. Since the statutory policies are in alignment, the employees in arbitration cases have not and could not make the arguments that Plaintiffs make here.

Here, by contrast, the waiver of collective-action rights furthers no statutory policy of Congress. It furthers only the private interests of Capital One. The policies underlying the FAA and collective-bargaining statutes are inapplicable, and the Court must look solely to the public policies underlying the "particular statute[s]" at issue—Section 16(b), the FLSA, and the ADEA. *O'Neil*, 324 U.S. at 705. Put another way: here there is only one edge to the public-policy sword, and it cuts against waiver. *Cf. Westvaco Corp.*, 171 F.3d at 977.

A review of the arbitration cases concerning collective-action waivers reveals that their holdings do not apply to agreements that retain the judicial forum. For example, in *Adkins*, the Fourth Circuit held that the employee's "inability to bring a class action . . . cannot by itself suffice to defeat the strong congressional preference for an arbitral forum." *Adkins,* 303 F.3d at 503. But *Adkins* says nothing about collective-action waivers when the parties retain their right to proceed in court. The Fourth Circuit refrained from making any broad statements about collective-action waivers, instead holding that Adkins' "failure to carry his burden of proof" rendered his complaint about his inability to bring a class action moot, and specifically resting its decision on the congressional policy favoring arbitration. *Id.* at 503. Indeed, the employee's principal brief in

26

*Adkins* contained no discussion of the legislative history, text, or structure of Section 16(b). *See id.* ("Adkins points to no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute."); Appellants' Br., *Adkins v. Labor Ready, Inc.*, No. 01-2304, 2002 WL 34570228, at 40-43 (4th Cir. May 5, 2002) (making vague statements about the policies underlying the FLSA and failing to cite the portions of the legislative record Plaintiffs cite here).

In short, neither *Adkins* nor any other controlling case addressed the question presented here. *See United States v. Prince-Oyibo*, 320 F.3d 494, 500 (4th Cir. 2003) (a prior panel's ruling does not constitute binding precedent where the panel "sidestepped" the question "on the ground that the appellant there had not raised it"). "Judicial decisions do not stand as binding 'precedent' for points that were not raised, not argued, and hence not analyzed." *United States v. Rand*, 835 F.3d 451, 463 (4th Cir. 2016) (quoting *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 557 (2001) (Scalia, J., dissenting)).

Similarly, arbitration cases from the Supreme Court and other circuits also did not address or analyze the arguments raised here. These cases instead hinge their analyses on the strong legislative policy favoring arbitration on an individualized basis. *See Gilmer*, 500 U.S. at 35 (allowing waiver after a discussion of the FAA and noting that prior cases "not decided under the FAA" are inapposite to the question of whether ADEA claims are arbitrable because they did not take into account the "liberal federal policy favoring arbitration agreements"); *Penn Plaza*, 556 U.S. at 255-60 (examining the "two federal statutes at issue in this case" and applying the reasoning of *Gilmer* in the collective-bargaining context); *Epic Systems*, 138 S. Ct. at 1631 (allowing waiver of class-action rights because "a contract defense 'conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures' is inconsistent with the Arbitration Act and its saving clause"); *Killion*, 761 F.3d at 591-92 (citing cases from other federal circuits and concluding that none of these "authorities speak to the validity of a collective-action waiver outside of the arbitration context").

In the small handful of cases where district courts have allowed standalone waivers of collective-action rights outside of the arbitration or collective-bargaining context, the courts also did not address the arguments Plaintiffs raise here. *See, e.g.*, *Benedict v. Hewlett-Packard Co.*, 2016 WL 1213985, at \*\*2-5 (N.D. Cal. Mar. 29, 2016); *Feamster v. Compucom Sys., Inc.*, No. 7:15-CV-00564, 2016 WL 722190, at \*3-4 (W.D. Va. Feb. 19, 2016). Consideration of Plaintiffs' arguments here, which apparently were not raised in those cases, requires a different outcome.

It therefore does not and cannot follow from the arbitration cases that waiver of the right to proceed collectively in a *court action* accords with the statutory policies of the ADEA and FLSA. *See id.* It does not. It impedes Congress' stated policies. *Killion*, 761 F.3d 574.

## VII.    Analysis of the "Four Corners" of Capital One's Letter of Agreement Defeats its Claim that Plaintiffs have Waived their Rights to Proceed.

Even if this Court finds Plaintiffs' contracts enforceable, they do not cover Plaintiffs' right to proceed collectively under the FLSA and ADEA.

Virginia law applies a strict rule that the parties' intent is derived from the "entire instrument" and not from detached portions. *Sweely Holdings, LLC v. R. SunTrust Bank*, 296 Va. 367 (2018). Any written ambiguities are construed against the drafter of the agreement. *Doctors Co. v. Women's Healthcare Assocs.*, 285 Va. 566 (2013). A close look at the entire Letter of Agreement defeats Capital One's argument that Plaintiff waived her right to proceed collectively under the FLSA or ADEA.

### A.    The Letter of Agreement

The Letter of Agreement signed by Stirnweis and Hutchens contained a heading called "General Release of Claims" which states "you release (i.e., give up) all claims that you presently have or have had against Capital One…except that you are not releasing claims that the law does not permit you to waive by signing this Agreement." (Hutchens, Compl. Ex. 1 at 2, ECF No. 1-1; Curwood Decl., Ex. 1 at 2.) The Letter of Agreement goes on to list "Types of Claims Waived" as "all claims of any kind…except for claims that the law does not permit you to waive by signing this Agreement." *Id.* Capital One then proceeds to list "example[s]" of claims being released to

include:

> *all claims* you might have of employment discrimination or violations of civil rights including without limitation all claims *arising under* Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Acts of 1866 and/or 1871, 42 U.S.C. Section 1981, the Americans With Disabilities Act of 1990, the *Age Discrimination in Employment Act ("ADEA")*, the Fair Credit Reporting Act, The Family Medical Leave Act, Executive Order 11246, the Rehabilitation Act of 1973, the Employee Retirement Income Security Act of 1974 ("ERISA"), any state human rights act, *or any other applicable federal*, state or local *statute*, law or ordinance. All claims for incentive compensation awards under any Capital One plan or payroll practice, along with any claims under any state wage and hour laws, are specifically subject to this release of claims.

*Id.* at pp. 2-3 (emphasis added). The Agreement does not identify which "other applicable federal…statute[s]" are purported to be subject to the release.

In the "Claims Not Waived" section of the Letter Agreement, Capital One specifically excludes from the "General Release" the following claims:

1.    An action to challenge the "validity of your release of claims under the ADEA;"

2.    ERISA Section 502(a)(1)(B) claims for vested benefits (other than severance);

3.    Claims that "may arise after the date on which you sign this Agreement;"

4.    Filing a claim for workers' compensation benefits; and

5.    The "right to enforce the terms of this Agreement."

*Id.* at 3.   Under this same section where these five specific exclusions are listed, the Letter of Agreement states generally, "any claims which cannot be lawfully waived are excluded from this General Release of Claims in this Agreement and by executing this Agreement you are not waiving any such claims."

Next, the purported "Class or Collective" waiver states:

> **Class or Collective Actions and Multi-Party Litigation Claims.**
> *If any claim is not subject to release*, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Capital One or any of the other Released Parties is a party.

*Id.* (emphasis added).

**B.**     **The Agreement by its terms does not compel waiver by Stirnweis or Hutchens to proceed with a collective action.**

    **i.**     **Stirnweis - The Agreement requires Plaintiff to "represent" she has been "paid all wages [and] overtime," which means that within the four corners of the Agreement, Plaintiff has no overtime "claim."**

The Letter of Agreement drafted by Capital One purports to release "all claims that you presently have or have had against Capital One." Id. at 2 (under 'General Release of Claims"). The Agreement however does not define the term "claims." Words used in a contract are given their "usual, ordinary, and popular meaning." *RECP IV WG Land Investors LLC v. Capital One Bank USA, N.A.*, 295 Va. 268 (2018). Black's Law Dictionary defines the term "claim" as:

> A legal assertion; a legal demand; Taken by a person wanting compensation, payment, or reimbursement for a loss under a contract, or an injury due to negligence. 2. Amount a claimant demands.

Black's Law Dictionary Free Online Legal Dictionary 2nd Ed. https://thelawdictionary.org/claim/ (as of January 14, 2020).

Under the "Warranties and Representations" section, the Agreement required Plaintiff to make the following representation in order to receive her severance: "[Y]ou represent that … you were paid all wages [and] overtime… amounts that Capital One or any of the Released Parties should have paid you in the past." *Id.* at 4. By the very terms of this warranty and representation, the parties were acknowledging, for purposes of this Agreement, that no *claim* existed for Plaintiff to assert for unpaid overtime. Because Plaintiff was "paid" all of her overtime (according to the Agreement), she had no legal "demand" or "assertion" for "compensation, payment or reimbursement" for any loss of overtime. In other words, per the terms of the Agreement that Capital One drafted, Plaintiff had no *claim* for overtime. Yet, under the Agreement, only "claims" are subject to the "General Release of *Claims*" as well as the release described under "Types of Claims Waived," which states "[t]his release includes all *claims*…" Id. at 2 (emphasis added).

More importantly, the "Class or Collective Action" waiver only applies to "any *claim* not subject to release," and "any action or proceeding based on such a *claim*." Id. at 3 (emphasis added). But by the very terms of the Agreement that Capital One drafted, no overtime "claim" existed for Plaintiff to assert. Therefore, taking into account the entire Agreement, which included

Plaintiff's representation that she was paid all overtime by Capital One, the purported class/collective waiver for "any *claim* not subject to release" cannot include within its scope the non-claim for overtime.

Capital one could have avoided this result by omitting the "Warranty and Representation" that Plaintiff was paid all of her overtime. Or it could have specifically drafted the class/collective waiver to state: "you waive your right to bring or join any collective action under the FLSA or ADEA." But as the sole drafter of this Agreement, Capital One is stuck with the language and terms it drafted, which created a universe where "overtime" is wholly excluded from "any claim" because of the representation that Plaintiff was fully paid for her overtime. *See City of Richmond v. New Irish, LLC*, 2019 Va. Unpub. LEXIS 26, 2019 WL 5459231 (S.Ct. of Va. 2019) (unpublished) ("as the drafter of the agreement, the City could have included" language to protect itself against certain claims). Therefore, Capital One cannot assert that Stirnweis has waived her class or collective rights since the Agreement it drafted does not require her to do so.

> **ii.     Hutchens - By its plain and unambiguous terms, Hutchens' ADEA claims are intended to be "subject to release" hence not subject to the class/collective waiver.**

Under Virginia law, courts determine the intent of the contracting parties by looking at the plain contractual language. *See Bender-Miller Co. v. Thomwood Farms, Inc.*, 179 S.E.2d 636, 638 (Va. 1971). Courts must construe contractual language according to its plain and ordinary meaning. *See Appalachian Power Co. v. Greater Lynchburg Transit Co.*, 374 S.E.2d 10, 12 (Va. 1988). "'[W]here an agreement is complete on its face, is plain and unambiguous in its terms, the court is not at liberty to search for its meaning beyond the instrument itself.'" *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983) (quoting *Globe Iron Constr. Co. v. First Nat'l Bank*, 140 S.E.2d 629, 633 (Va. 1965)).

By looking at the plain contractual language of the Agreement, Capital One plainly intended Plaintiff Hutchens' ADEA claims to be "subject to release." Hutchens, Compl. Ex. 1 at 2, ECF No. 1-1, under the heading "Types of Claims Waived," ("this release includes…the Age Discrimination in Employment Act ("ADEA")"; and *id.* at 4, under heading "Notification of

ADEA Rights and Claims" ("you understand that this Agreement specifically releases and waives all claims you may have for age discrimination under the ADEA, except for those that may arise after the date this Agreement is executed by you").

On the page between the above quoted language, the class/collective wavier plainly applies only to "any claim [] <u>not</u> subject to release." *Id.* at p. 3 (emphasis added). By the plain terms of the Agreement, the class/collective waiver language on page 3 does not purport to waive Plaintiff's right to file a class or collective action asserting any claim that <u>is</u> subject to the release. Stated differently, Capital One drafted the Agreement such that Hutchens' substantive ADEA claims are purportedly released; and that only collective/class actions are waived for any other claim "not subject to release."

Thus, reading the four corners of the contract drafted by Capital One and its attorneys, the "plain and ordinary" interpretation requires a finding that the parties did not intend for the class or collective waiver language to apply to the assertion of Hutchens' substantive ADEA claim.[1]

      **iii.**    **Stirnweis (FLSA) and Hutchens (ADEA) - Alternatively, the "not subject to release" language must be read to waive class/collective action of future claims only, not then-present FLSA or ADEA claims.**

Even if Stirnweis' overtime claim is considered a "claim" under the terms of the Agreement, (see *supra* part i. above arguing otherwise), the language of the collective waiver, when read literally (as it must be), does not purport to waive Stirnweis' or Hutchens' respective right to assert a collective action under the FLSA or ADEA.

The Plain terms of the waiver language states: "*If any claim is not subject to release*, to the extent permitted by law, you waive any right or ability to be a class or collective action representative…" *Id.* (emphasis added). Therefore, as plainly drafted by Capital One, the purported class/collective waiver can <u>only</u> apply to (1) a "claim," (2) which "is not subject to release."

The language used here does *not* state:

---

[1] Whether the Agreement validly releases Hutchens' substantive ADEA claim is not a question before the court at this stage, rather that is to be determined in Count 1 (alleging OWBPA violation) of Hutchens' Complaint (ECF. No. 1). The plain language of the Agreement however confirms that Hutchens' may proceed with a collective action in Count 2 (ADEA violation). *Id.*

- "any claim not subject to *this* release;" or

- "any claim not subject to this General Release of Claims;" or

- "any claim not subject to your release."

The failure of Capital One to so clarify in this part of the Agreement is significant. Elsewhere in the Agreement, the term "release" is always modified by "the," "this," "you," "your," or "General." The only occasion where the word "release" has no modifier is in the purported class/collective waiver language: "If any claim is not subject to release."

The plain meaning of "any claim is not subject to release," by its very terms does not include ADEA or FLSA claims. This is because ADEA and FLSA claims are subject to release, albeit the latter upon court or Department of Labor (DOL) approval. *See supra* at 9. The collective action waiver that Capital One drafted clearly limits solely future claims that have not yet accrued, as future claims are "not subject to release." This intention of the Agreement is confirmed in the "Claims Not Waived" section where it states "you are not releasing any rights or claims that may arise after the date on which you sign this Agreement."

The Supreme Court of Virginia instructs that the parties' intent must be derived from the "entire instrument." *Sweely Holdings*, 296 Va. at 377. Capital One modifies the term "release" throughout the agreement when referring to the "general Release of Claim." In this instance where it does not so modify the term, it must be fairly read as written, that is to only apply to "claims not subject to release" in any form. This collective waiver therefore does not apply to ADEA or FLSA claims.

## <u>CONCLUSION</u>

For the reasons stated above, the collective action waivers in the Plaintiffs' Letters of Agreement are void and unenforceable an inapplicable to Plaintiffs' claims. The Court should enter declaratory judgment in favor of Stirnweis on Count 2 of her Complaint, and declaratory judgment in favor of Hutchens on Count 3 of hers.

Dated: January 15, 2020

Respectfully Submitted,

**Nannette Hutchens and
Virginia Stirnweis**

Plaintiffs


By:_____/s/_____
Craig Juraj Curwood (VSB No. 43975)
CURWOOD LAW FIRM, PLC
530 E. Main Street, Suite 710
Richmond, VA 23219
Telephone: (804) 788-0808
Fax: (804) 767-6777
Email: ccurwood@curwoodlaw.com

and

Adam W. Hansen, *Admitted Pro Hac Vice*
Eleanor Frisch, *Admitted Pro Hac Vice*
APOLLO LAW LLC
333 Washington Ave North
Suite 300
Minneapolis, MN 55401
Telephone: (612) 927-2969
Email: adam@apollo-law.com

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15<u>th</u> day of January, 2020, I electronically filed the foregoing using the Court's CM/ECF system, which will send a notification of such filing (NEF) to the following:

> Rodney A. Satterwhite, Esq.
> Christopher M. Michalik, Esq.
> Igor M. Babichenko, Esq.
> Summer Laine Speight, Esq.
> McGuireWoods LLP
> Gateway Plaza
> 800 E. Canal Street
> Richmond, Virginia 23219
> rsatterwhite@mcguirewoods.com
> cmichalik@mcguireoods.com
> ibabichenko@mcguirewoods.com
> sspeight@mcguirewoods.com

> By:     _____/s/_____
>         Craig Juraj Curwood