## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Richmond Division

**NANNETTE HUTCHENS,**

        **Plaintiff,**

**v.**                                             **Civil Action No. 3:19cv546**

**CAPITAL ONE SERVICES, LLC,** *et al.,*

        **Defendant.**

---

**VIRGINIA STIRNWEIS,**

        **Plaintiff,**

**v.**                                             **Civil Action No. 3:19cv637**

**CAPITAL ONE SERVICES, LLC,** *et al.,*

        **Defendant.**

### MEMORANDUM OPINION

These matters come before the Court on Defendants Capital One Services, LLC, Capital

One Financial Corporation, and Capital One, National Association's (collectively, "Capital

One") and Plaintiffs Nannette Hutchens and Virginia Stirnweis's (collectively, "Plaintiffs")

Cross-Motions for Judgment on the Pleadings pursuant to Federal Rule of Civil Procedure

12(c).[1] (Hutchens ECF Nos. 18, 20; Stirnweis ECF Nos. 21, 23.)[2] Capital One and Plaintiffs

---

[1] Federal Rule of Civil Procedure 12(c) provides: "After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

[2] Pursuant to separate orders entered in both matters on December 18, 2019, the Parties filed the same motion and identical accompanying briefs in *Hutchens v. Capital One, et al.* (3:19cv546) as in *Stirnweis v. Capital One, et al.* (3:19cv637). (Hutchens Dec. 18, 2019 Order,

responded. (ECF Nos. 22, 23.) The matter is ripe for disposition. The Court dispenses with oral argument because the materials before it adequately present the facts and legal contentions, and argument would not aid the decisional process. The Court exercises jurisdiction pursuant to 28 U.S.C. § 1331.[3] For the reasons that follow, the Court will grant Capital One's Motion for Judgment on the Pleadings, and deny Plaintiffs' Motion for Judgment on the Pleadings.

### I. Factual and Procedural Background

#### A.   Introduction:  Plaintiffs Seek a Declaratory Judgment That They May Proceed In a Collective Action Against Capital One

These matters arise from Plaintiffs' employment with and subsequent termination by Capital One. Hutchens, a former "Project Manager /Program Manager/ IT Delivery Lead" for Capital One, asserts that Capital One failed to comply with the statutory requirements of the Older Workers Benefits Protection Act ("OWBPA")[4] when Capital One terminated her employment, and that Capital One discriminated against her because of her age in violation of

---

ECF No. 12; Stirnweis Dec. 18, 2019 Order, ECF No. 15.) Unless otherwise indicated, the Court will identify documents from each case by stating the respective plaintiff's name before the referenced document. The Court will refer to the Parties' briefing in support of their Motions for Judgment on the Pleadings by the ECF numbers within the briefing as entered in *Hutchens v. Capital One, et al.* (19cv546).

[3] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. Hutchens brings claims pursuant to the Older Workers Benefits Protection Act ("OWBPA"), 29 U.S.C. § 626(f)(1) and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.* Stirnweis asserts claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

[4] The OWBPA "imposes specific requirements for releases covering ADEA claims" and prevents an employee from waiving "an ADEA claim unless the employer complies with the statute." *Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 424, 427 (1998). Under the OWBPA, "[a]n individual may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1).

the Age Discrimination in Employment Act ("ADEA").[5]  (Hutchens Compl. ¶¶ 74, 77, ECF

No. 1.)  Stirnweis, a former "Corporate Insurance Specialist" at Capital One, brings claims for

"unpaid overtime in violation of the Fair Labor Standards Act."[6]  (Stirnweis Compl. ¶ 1, ECF

No. 1.)  When Capital One terminated their employment, both Plaintiffs had executed severance

agreements, (the "Severance Agreements"), which contained identical language purporting to

waive their right to bring a collective or class action (the "Collective Action Waiver").[7]

Although Plaintiffs bring their Complaints on an individual basis, each seeks a

declaratory judgment that they may proceed in a collective action against Capital One.[8]  Capital

One asserts that the Collective Action Waiver binds Plaintiffs and forecloses a class claim;

Plaintiffs contend that the Collective Action Waiver is invalid under federal law, and that the

---

[5] The ADEA was enacted "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." *EEOC v. Balt. Cty.*, 904 F.3d 330, 333–34 (4th Cir. 2018) (quoting 29 U.S.C. § 621(b)).

[6] Congress enacted the FLSA to combat the "evils and dangers resulting from wages too low to buy the bare necessities of life and from long hours of work injurious to health." *Schilling v. Schmidt Baking Co.*, 876 F.3d 596, 599 (4th Cir. 2017) (quoting S. Rep. No. 75-884, at 4 (1937)).  "To that end, the FLSA establishes a federal minimum wage and requires employers to pay 'a rate not less than one and one-half times the regular rate' to employees who work more than [forty] hours in a single workweek." *Id.* (quoting 29 U.S.C. §§ 206(a), 207(a)(1)).

[7] The Collective Action Waiver states that:

If any claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action or proceeding based on such a claim in which Capital One or any of the other Released Parties is a party.

(Hutchens Compl., Ex. 1, "Hutchens Severance Agr.," 3, ECF No. 1-1; Stirnweis Mem. Supp. Mot. Judg., Decl. Craig J. Curwood, Ex. 1, "Stirnweis Severance Agr.," 3, ECF No. 24-1.)

[8] Hutchens brings her claim for a declaratory judgment in Count III of her Complaint. (*See* Hutchens Compl. ¶¶ 92–120.)  Stirnweis brings her claim for a declaratory judgment in Count II of her Complaint. (*See* Stirnweis Compl. ¶¶ 48–83.)

3

plain language of the Collective Action Waiver does not apply to the claims in their respective

Complaints. On December 18, 2019, the Court ordered the Parties to file cross-briefs concerning

the validity of the Collective Action Waiver under the FLSA and the ADEA.[9] (Hutchens Dec.

18, 2019 Order; Stirnweis Dec. 18, 2019 Order.)

**B.    Factual Background[10]**

The Court will provide a description of Plaintiffs' Complaints before turning to the

language of the Severance Agreements.

**1.    Hutchens's Factual Allegations**

In 2007, Capital One hired Hutchens "as a contractor" before converting her to "an

associate in 2010." (Hutchens Compl. ¶ 12.) During the time frame pertinent to her suit,

Hutchens "worked as a Project Manager /Program Manager/ IT Delivery Lead for Capital One."

(*Id.* ¶ 14.)

Capital One "has five categories for its performance evaluation ratings scale:

Exceptional, Very Strong, Strong, Inconsistent, Action Required." (*Id.* ¶ 15.) Hutchens asserts

---

[9] Both Hutchens's and Stirnweis's Complaints contain language stating that the Severance Agreements are contracts "of adhesion." (Hutchens Compl. ¶ 110; Stirnweis Compl. ¶ 70.) Despite this, Plaintiffs do not include any analysis in their fifty-five (55) pages of briefing as to why the Severance Agreements are contracts of adhesion. They mention "adhesion" only once in passing when describing the factual background of Hutchens's claims. (*See* Pls.' Mem. Supp. Mot. Judg. Plead. 5, ECF No. 21) ("Hutchens'[s] agreement, like Stirnweis'[s] agreement, was a contract of adhesion and purported to release all claims of any kind that she had against Capital One" (internal quotations omitted)). The Court will not address Plaintiffs' isolated assertion here.

[10] "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). For the purpose of a Rule 12(b)(6) Motion to Dismiss, "a court 'must accept as true all of the factual allegations contained in the complaint' and 'draw all reasonable inferences in favor of the plaintiff.'" *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus.*, 637 F.3d 435, 440 (4th Cir. 2011)).

that during her employment at Capital One "she consistently received performance evaluations in the Strong, Very Strong, or Exceptional [categories]." (*Id.* ¶ 17.) In October 2017, however, Capital One instituted a policy "forcing managers to rank [twelve percent] of its employees as not meeting expectations in the next round of performance evaluations." (*Id.* ¶ 18.) Pursuant to that policy, Capital One placed twelve percent of employees on a "coaching plan" or "performance improvement plan" and Capital One required "a sub-section of [that group] . . . to be involuntarily terminated." (*Id.* ¶¶ 21, 22.)

Hutchens states that Capital One ultimately sought to re-classify "objectively well-performing employees" as "poor performers" through the policy, thereby allowing Capital One to terminate those employees and increase "'involuntary attrition' rates." (*Id.* ¶¶ 49–50.) By involuntarily terminating the employment of older employees in particular, Capital One could "make room for . . . new recruits in their early to mid-20's" who had recently graduated from college. (*Id.* ¶ 47.)

In March 2018, despite previously strong performance reviews, "Hutchens was informed, out of the blue, that she was no longer meeting expectations and was placed on a 'coaching plan.'" (*Id.* ¶ 54.) Hutchens asserts that "[t]he coaching plan [indicating] . . . that Hutchens was a poor performer was pretextual and false, and was issued in order to meet Capital One's forced requirement that [twelve percent] of employees be placed on coaching plans or PIPs." (*Id.* ¶ 56.) Specifically, Hutchens notes that her "supervisor issued coaching plans to the two oldest employees in her group." (*Id.* ¶ 83.) Hutchens asserts that "[b]ut for [her] age, she would not have been placed on a 'coaching plan,' nor selected for [a performance improvement plan] or termination." (*Id.* ¶ 84.) Overall, "Capital One's facially neutral policy . . . has a disparate impact on employees over age 40." (*Id.* ¶ 62.)

5

On August 6, 2018, six months after placing Hutchens on a performance improvement plan, Capital One terminated her employment. (*See* Hutchens Severance Agr. 1.) Around that time, Capital One "provided, and Hutchens signed, a Letter of Agreement . . . which provided her severance pay in exchange for waiving certain claims against Defendants." (Hutchens Compl. ¶ 64.) Upon Hutchens's termination, Capital One "failed to comply with the OWBPA requirement that affected employees be given 45 days to consider the release, and that ages and job titles of associates be provided." (*Id.* ¶ 65.)

Hutchens's Complaint brings three counts. In Count I, Hutchens asserts that Capital One violated the statutory requirements of the OWBPA because her Severance Agreement did not provide her with the requisite "[forty-five] days to consider the waiver of any rights or claims under the ADEA" nor "the job titles and ages of all individuals selected or not selected for termination." (*Id.* ¶¶ 72–73.) In Count II, Hutchens claims that Capital One violated the ADEA because it discriminated against her on the basis of her age. (*Id.* ¶¶ 76–91.) In Count III, the claim at issue here, Hutchens asserts that the "purported collective/class action waiver issued by Capital One in its [Letter of] Agreement is not permitted by law." (*Id.* ¶ 100.) To that end, Hutchens "seeks declaratory relief from this Court to determine whether the specific purported class/collective waiver language in the [Letter of] Agreement is valid and/or enforceable, or void and/or unenforceable. (*Id.* ¶ 116.)

### 2.    Stirnweis's Factual Allegations

In 2009, Capital One hired Stirnweis. (Stirnweis Compl. ¶ 12.) During the time frame pertinent to her suit, "Stirnweis worked as a Corporate Insurance Specialist for Capital One" (*Id.* ¶ 13.) In this role, Stirnweis served "as the support person for and main point of contact

between Capital One and its workers' compensation insurance and property insurance vendors." (*Id.* ¶ 16.)

Because Corporate Insurance Specialists worked all hours, Capital One "issued Stirnweis and other Corporate Insurance Specialists iPhones and take-home laptops so that each could perform work for Capital One's benefit remotely." (*Id.* ¶ 15.)  Risk specialists, such as Stirnweis, "are not required to exercise discretion or independent judgment involving matters of significance in carrying out their duties," (*id.* ¶ 22), nor do they "perform as a primary duty managerial tasks over other employees," (*id.* ¶ 23).  Based on the nature of a risk specialist's job responsibilities, Stirnweis asserts that "there is no FLSA exemption that applies to preclude her or other risk specialists from being paid one and one-half times their regular rate of pay for all hours worked in excess of [forty hours] per week." (*Id.* ¶ 27.)

Despite the lack of any FLSA exception for risk specialists, Capital One "paid Stirnweis on a salary basis, and classified her and other risk specialists as exempt from receiving overtime under the FLSA." (*Id.* ¶ 28.)  Stirnweis states that, instead, she should have earned overtime during her roughly decade long employment at Capital One.  Stirnweis "regularly worked in excess of [forty] hours a week," (*id.* ¶ 29), and Capital One did not require her "to keep precise track of her hours worked," (*id.* ¶ 30).  Nonetheless, Capital One "knew or should have known that Stirnweis was working overtime hours without being paid" and that Capital One received the "benefit of the work performed by Stirnweis." (*Id.* ¶¶ 34, 35.)  Despite Capital One's knowledge that Stirnweis routinely worked in excess of forty hours a week, Capital One failed to "pay Stirnweis an overtime premium for all hours she worked over [forty hours] per week." (*Id.* ¶ 33.)

On or about January 5, 2019, Capital One terminated Stirnweis's employment. (*Id.* ¶ 60.)  On January 6, 2019, Capital One "provided and Stirnweis signed, a Letter of Agreement . . .

which provided her severance pay in exchange for waiving certain claims against" Capital One. (*Id.* ¶ 61; *see also* Stirnweis Severance Agr.)  Stirnweis asserts that "similarly situated risk specialists have signed a severance [Letter of] Agreement similar to the one signed by [Stirnweis]." (Stirnweis Compl. ¶ 62.)

Stirnweis's Complaint brings two counts.  In Count I, Stirnweis asserts that Capital One failed to pay her overtime wages in violation of the FLSA.  (*Id.* ¶¶ 40–47.)  In Count II, the claim at issue here, Stirnweis states that the "purported collective/class action waiver issued by Capital One in its Agreement is not permitted by law," (*id.* ¶ 66), and seeks a declaratory judgment that the Collective Action Waiver in her severance agreement is invalid.

### 3.     The Severance Agreements at Bar

Following their termination from Capital One, both Hutchens and Stirnweis signed the Severance Agreements.  (Hutchens Severance Agr; Stirnweis Severance Agr.)

Plaintiffs' Severance Agreements included identical language purporting to limit the scope and nature of certain claims that Plaintiffs could bring against Capital One.  Specifically, the Severance Agreements stated that:

> **General Release of Claims.**
> On behalf of yourself and your agents, representatives, and heirs, you release (i.e., give up) all claims that you presently have or have had against Capital One (as defined above), including without limitation, CAPITAL ONE FINANCIAL CORPORATION, CAPITAL ONE SERVICES, LLC, CAPITAL ONE SERVICES II, LLC, CAPITAL ONE, NATIONAL ASSOCIATION, CAPITAL ONE BANK (USA), NATIONAL ASSOCIATION, as well as its former parents, subsidiaries, affiliates all other related entities and organizations . . . except that you are not releasing claims that the law does not permit you to waive by signing this Agreement.
>
> **Types of Claims Waived.**
> This release includes all claims of any kind, whether known or unknown, which you ever have had in the past or presently have against any or all of the Released Parties, including but not limited to any claim arising from or relating to your employment with any of the Released Parties or the termination of that employment

or any circumstances related to that termination, ***except for claims that the law does not permit you to waive by signing this Agreement.*** For example, you are releasing all common law contract, tort, or other claims you might have, as well as all claims you might have of employment discrimination or violations of civil rights including without limitation all claims arising under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1991, the Civil Rights Acts of 1866 and/or 1871, 42 U.S.C. Section 1981, the Americans With Disabilities Act of 1990, ***the Age Discrimination in Employment Act ("ADEA"),*** the Fair Credit Reporting Act, The Family Medical Leave Act, Executive Order 11246, the Rehabilitation Act of 1973, the Employee Retirement Income Security Act of 1974 ("ERISA"), any state human rights act, or any other applicable federal, state or local statute, law or ordinance. All claims for incentive compensation awards under any Capital One plan or payroll practice, along with any claims under any state wage and hour laws, are specifically subject to this release of claims . . . .

**Class or Collective Actions and Multi-Party Litigation Claims.**
***If any claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action*** or proceeding based on such a claim in which Capital One or any of the other Released Parties is a party.

**Claims Not Waived.**
Notwithstanding any other provision of the Agreement, your agreement to the provisions under 'General Release of Claims' is not intended to prohibit you from bringing an action to challenge the validity of your release of claims under the ADEA.

(Hutchens Severance Agr. 2–3; Stirnweis Severance Agr. 2–3 (emphases added)).

Later in the Severance Agreements, Capital One included language purporting to limit

Plaintiffs' ability to bring suit pursuant to the ADEA. That section reads:

As outlined above in the "General Release of Claims" provision, you understand that this Agreement specifically releases and waives all claims you may have for age discrimination under the ADEA, except for those that may arise after the date this Agreement is executed by you. Likewise, you understand that this Agreement does not prohibit you from challenging the validity of your release of claims under the ADEA.

(Hutchens Severance Agr. 4–5; Stirnweis Severance Agr. 5.)

Under a section entitled "Warranties and Representations," the Severance Agreements

state that "you . . . have properly reported all hours that you have worked and you have been paid

9

all wages, overtime, commissions, incentives, compensation, benefits, and other amounts that

Capital One or any of the Released Parties should have paid you in the past." (Hutchens

Severance Agr. 5; Stirnweis Severance Agr. 5.)

The Severance Agreements contained sections entitled "Consideration for Signing"

which stated that the undersigned

> acknowledge[s] and agree[s] that the payments and other benefits provided for you
> in this Agreement are good, valuable, and sufficient consideration for your
> promises in this Agreement, including but not limited to the 'General release of
> Claims.'

(Hutchens Severance Agr. 1; Stirnweis Severance Agr. 1.)

Under the section labeled "Severance Pay" in each agreement, Capital One agreed to pay

Hutchens and Stirnweis a certain sum, based on their current salary, on the condition that

Hutchens and Stirnweis "agree to and do not revoke the terms set forth in this Agreement,

specifically, but without limitation, your agreement to the provisions under 'General Release of

Claims' and 'Non-solicitation of Employees.'" (*Id.*) Capital One paid Hutchens $30,732.13, or

the equivalent of twelve-weeks of her regular base salary. (Hutchens Severance Agr. 1.) Capital

One paid Stirnweis $31,414.26, or the equivalent of twenty-weeks of her regular base salary.

(Stirnweis Severance Agr. 1.)

### C.    Procedural History

On July 30, 2019, Hutchens filed her Complaint. (*See* Hutchens Compl.) One month

later, on August 30, 2019, Stirnweis filed her Complaint. (*See* Stirnweis Compl.) The Court

issued orders on December 18, 2019 in both matters, requiring the Parties to submit cross briefs

to "(a) address the validity of the collection action waiver under the FLSA; (b) address the

validity of the collective action waiver under the ADEA; and, (c) compare and contrast the

validity of the collective action waiver under both the FLSA and ADEA." (Hutchens Dec. 18, 2019 Order 1; Stirnweis Dec. 18, 2019 Order 1.)

For the reasons stated below, the Court will grant Capital One's Motion for Judgment on the Pleadings. First, the Court is constrained to find that the Collective Action Waiver contained within the Severance Agreements is valid under federal law. The plain language of the Severance Agreements, as many courts have recognized, forbid Hutchens and Stirnweis from bringing their respective FLSA and ADEA claims on a collective basis. The Court will deny Plaintiffs' claims seeking a declaratory judgment that the Collective Action Waiver is invalid, but will allow Plaintiffs' individual claims against Capital One under the OWBPA, ADEA and FLSA to proceed.

## II. Standard of Review

### A.   Motion for Judgment on the Pleadings:  Rule 12(c)

Federal Rule of Civil Procedure 12(c) allows a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). "A motion for judgment on the pleadings under Rule 12(c) is assessed under the same standards as a motion to dismiss under Rule 12(b)(6)." *Occupy Columbia v. Haley*, 738 F.3d 107, 115 (4th Cir. 2013) (citing *City of Goldsboro*, 178 F.3d at 243). "A Rule 12(c) motion for judgment on the pleadings therefore is also analyzed for compliance with the Supreme Court's holdings in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)." *Trustees of Columbia Univ. in City of New York v. Symantec Corp.*, 425 F. Supp. 3d 601, 607 (E.D. Va. 2019) (citations omitted).

"It is axiomatic . . . that for purposes of the court's consideration of the Rule 12(c) motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be

true and all contravening assertions in the movant's pleadings are taken to be false." 5C ARTHUR

R. MILLER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1368 (3d ed. 2019) (citing cases).

Similar to a Rule 12(b)(6) motion, the Court must view all "the inferences to be drawn [from the

facts] in the light most favorable to the nonmoving party." *Id.* "To survive a motion for

judgment on the pleadings, a pleading need only provide a short and plain statement of the claim

showing that the pleader is entitled to relief, in order to give the defendant fair notice of

what . . . the claim is and the grounds upon which it rests." *Sum of Three Hundred Nine Million*

*Five Hundred Thousand Dollars*, 85 F. Supp. 3d at 115 (citing *Twombly*, 550 U.S. at 555)

(internal quotation marks omitted).

### III. Analysis: Validity of the Collective Action Waiver

The Court first addresses the validity of the Collective Action Waiver in Plaintiffs'

Severance Agreements, concluding that it is valid and enforceable under federal law. First,

applying the fundamental principles of statutory interpretation, and in accordance with the

United States Court of Appeals for the Fourth Circuit's decision in *Adkins v. Labor Ready, Inc.*,

303 F.3d 496 (4th Cir. 2002), the Court determines that the text of the FLSA does not evince an

intent to create a non-waivable right to a class action. Second, the Court similarly concludes that

neither the text of the ADEA, nor the amendments of the OWBPA, create a non-waivable right

to a class action. Third, the Court addresses, and rejects, Plaintiffs' arguments that without a

collective action mechanism with which to press their claims, they will be unable to effectively

vindicate their federal rights under the FLSA or the ADEA.

### A.    Legal Standard:  Fundamental Principles of Statutory Interpretation

The purpose of statutory interpretation is "to try to determine congressional intent." *Dole*

*v. United Steelworkers of Am.*, 494 U.S. 26, 35 (1990). The analysis must "begin, as always,

with the language of the statutory text," and "[i]n the absence of a definition from Congress, [the Court] accord[s] words in a statute their ordinary, contemporary, common meaning." *United States v. Midgett*, 198 F.3d 143, 145–46 (4th Cir. 1999) (internal citation and quotation marks omitted); *see also Pioneer Inv. Servs. Co. v. Brunswick Assoc. Ltd. P'ship*, 507 U.S. 380, 388 (1993) ("Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))).

A Court must look to the statute as a whole in determining the meaning of individual words because "the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991); *see also Dole*, 494 U.S. at 35 ("[I]n expounding a statute, we are not guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." (internal citation and quotation marks omitted)). And courts should read statutes, "where possible[,] as effecting a 'symmetrical and coherent regulatory scheme.'" *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 99 (2006) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). When "the statutory language is unambiguous and the statutory scheme is coherent and consistent," judicial inquiry normally ends. *Ignacio* v. *United States*, 674 F.3d 252, 254 (4th Cir. 2012).

## B. The Language of the FLSA Indicates that Employees May Waive Their Right to Proceed in a Collective Action Under the Statute

The FLSA did not create a non-waivable right to proceed in a collective action. In support of that conclusion, the Court first turns, as it must, to the text of the FLSA. Next, the Court looks to the Fourth Circuit's decision in *Adkins*, which analyzed the FLSA in the context of arbitration agreements. Applying *Adkins* and the principles of statutory interpretation, the

Court determines that the language of FLSA did not create a non-waivable right to proceed in a collective action under the statute.

### 1. The Text of the FLSA

The Court begins with the text of the FLSA. Section 29 U.S.C. § 216 sets forth the collective action procedure for employees under the FLSA. It reads, in pertinent part that

> [a]n action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he [or she] gives his [or her] consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). The FLSA also specifies the means by which an employee may waive his or her right to overtime compensation. In 29 U.S.C. § 216(c), the FLSA authorizes

> [t]he Secretary [of Labor] . . . to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee or employees under section 206 or section 207 of this title, and the agreement of any employee to accept such payment shall upon payment in full constitute a waiver by such employee of any right he may have under subsection (b) of this section to such unpaid minimum wages or unpaid overtime compensation and an additional equal amount as liquidated damages.

29 U.S.C. § 216(c).

### 2. The Fourth Circuit Stated that the FLSA Did Not Contain a Non-Waivable Right to a Collective Action in *Adkins v. Labor Ready, Inc.*

The Fourth Circuit has previously discussed the nature of the FLSA's collective action procedure, and found that the FLSA itself did not evince Congressional intent to foreclose an employee from waiving his or her right to a collective action. The Fourth Circuit has concluded that there exists "no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute." *Adkins*, 303 F.3d at 503.

14

In *Adkins*, the plaintiff brought a class action alleging that his employer had violated FLSA and various state laws. 303 F.3d at 499. The plaintiff, however, had signed an agreement to arbitrate any dispute arising out of his employment, and the employer moved to compel arbitration. *Id.* The district court ordered the parties to submit their claims to arbitration and dismissed the suit. *Id.* at 500.

On appeal, the plaintiff claimed that the agreement to arbitrate was unconscionable because the large costs of arbitration would effectively prevent him from asserting his federal rights. *Id.* at 502. Applying the "clear federal command that courts cannot treat arbitration in general as an inferior or less reliable means of vindicating important substantive rights," the Fourth Circuit rejected this argument. *Id.*

In rejecting the plaintiff's arguments, the Fourth Circuit first determined that the plaintiff had not met his burden of "showing the likelihood of incurring" prohibitive costs in arbitration, *id.* (quoting *Green Tree Fin. Corp.–Ala. v. Randolph*, 531 U.S. 79, 92 (2000)), thus mooting "his further complaint about the inability to bring a class action," *id.* at 503. The Fourth Circuit next explained that "simply because judicial remedies are part of a law does not mean that Congress meant to preclude parties from bargaining around their availability." *Id.* (quoting *Johnson v. West Suburban Bank*, 225 F.3d 366, 377 (3d Cir. 2000)). Specifically, with regard to the FLSA, the *Adkins* court found that

> [Plaintiff] points to no suggestion in the text, legislative history, or purpose of the FLSA that Congress intended to confer a nonwaivable right to a class action under that statute. His inability to bring a class action, therefore, cannot by itself suffice to defeat the strong congressional preference for an arbitral forum.

*Id.* The Fourth Circuit thus strongly suggested that the language of the FLSA did not create a right to a class action that a party could not waive or otherwise give up in a contract.

### 3.   The Fourth Circuit's Straightforward Reading of the FLSA Commands Allowing the Collective Action Waiver to Stand

Stirnweis attempts to differentiate *Adkins*, claiming that the plaintiff in that case did not fully brief the issue of whether the text of the FLSA allowed waiver of the collective action procedure, thus lessening its precedential value. At least three district courts within the jurisdiction of the Fourth Circuit, however, have determined that *Adkins* stands for the proposition that Congress did not intend to confer a non-waivable right to a class action under the FLSA. *See Dimery v. Convergys Corp.*, No. 4:17cv00701, 2018 WL 1471892, at *6 (D.S.C. Mar. 26, 2018); *Feamster v. Compucom Sys., Inc.*, No. 7:15cv00564, 2016 WL 722190, at *4 (W.D. Va. Feb. 19, 2016); *Adams v. Citicorp Credit Servs.*, 93 F. Supp. 3d 441, 449 (M.D.N.C. 2015) ("[T]he Fourth Circuit [in *Adkins*] previously addressed the question of the enforceability of a class action waiver under the FLSA and ruled the waiver enforceable in that case.").

This Court agrees. This is true because: (1) the statute's collective action procedure's permissive language; (2) its procedures for waiving overtime and other claims; (3) its overall structure; and, (4), a survey of other courts, in addition to those in the Fourth Circuit, consistently confirm that Congress did not intend to create a non-waivable right to a collective action.

### a.   The FLSA's Permissive Language Shows That the Collective Action Procedure May Be Waived

In evaluating "the language of the statutory text," the Court observes the permissive nature of the FLSA's collective action procedure. *Midgett*, 198 F.3d at 145–46. While a number of FLSA provisions utilize mandatory terms, the collective action procedure is distinctly optional. For instance, the FLSA's overtime provision states that "no employer *shall* employ any of his [or her] employees . . . for a workweek longer than forty hours unless such employee receives compensation for his [or her] employment in excess of the hours above." 29 U.S.C.

§ 207(a)(1) (emphasis added). The word 'shall' connotes a command which neither an employer nor an employee can avoid. An employer must pay overtime compensation, and an employee may not waive his or her right to overtime compensation without approval from the Secretary of Labor. *See* 29 U.S.C. § 216(c). In contrast, the FLSA's collective action section provides that a collective action "*may* be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b) (emphasis added).

As the Fourth Circuit has stated as to statutory interpretation, "[i]t is uncontroversial that the term 'shall' customarily connotes a command, whereas the term 'may' typically indicates authorization without obligation." *In re Rowe*, 750 F.3d 392, 397 (4th Cir. 2014) (internal citations omitted). Here, the FLSA "has employed the two different verbs in neighboring statutory passages." *Id.* (internal citations omitted). Such use leads to the "inference . . . that each [term] is used in its usual sense—the one act being permissive, the other mandatory." *Id.* (quoting *Anderson v. Yungkau*, 329 U.S. 482, 485 (1947)). Under this textual and structural approach, Congress has indicated through the FLSA that some of its provisions, such as those requiring the payment of overtime, cannot be waived without additional action. Others, such as the right to bring a collective action, may be waived.

### b. The FLSA's Limitation on Waiver of Other Rights Demonstrates That the Collective Action Procedure Could Be Waived

The FLSA's *express* limitation of an employee's ability to waive other claims demonstrates Congressional intent that the collective action procedure may be waived through an ordinary contract or severance agreement. As stated above, the FLSA allows an employee to waive a claim for unpaid overtime, but only under the supervision of the Secretary of Labor. *See*

17

29 U.S.C. § 216(c) ("The Secretary [of Labor] is authorized to supervise the payment of the unpaid minimum wages or the unpaid overtime compensation owing to any employee . . . and the agreement of any employee to accept such payment shall upon payment in full constitute a waiver by such employee of any right he may have under [29 U.S.C. §216(b)]"). This stringent limitation in the FLSA on an employee's ability to waive, for instance, overtime rights in the "same enactment make clear that Congress knew how to impose such a limitation when it so desired." *Nat'l Elec. Mfrs. Ass'n v. U.S. Dep't of Energy*, 654 F.3d 496, 507 (4th Cir. 2011). That Congress included limitations on waiver of overtime and unpaid minimum wage compensation within the FLSA, but not the collective action procedure, strongly suggests that Congress did not intend for the collective action right to be non-waivable.

Furthermore, Stirnweis's interpretation of the FLSA as forbidding waiver of the collective action procedure would create an inconsistency within the structure of the FLSA. Congress, through § 216(c), allowed an employee to waive his or her right to overtime compensation, a cornerstone of the FLSA's statutory mandate. *See, e.g., Shaliehsabou v. Hebrew Home of Greater Wash., Inc.*, 363 F.3d 299, 304 (4th Cir. 2004) ("The purpose of the FLSA is 'to protect all covered workers from substandard wages and oppressive working hours.'" (internal citations omitted)). It does not logically follow that Congress, in the same statute, would disallow an employee's waiver of the ability to bring a collective action to enforce the underlying rights (such as overtime pay) that are subject to waiver. Put plainly, such an approach would allow an employee to waive his or her right to overtime but not the right to proceed collectively in order to obtain that overtime. This would prove incompatible with a "symmetrical and coherent regulatory scheme.'" *Burton*, 549 U.S. at 99.

18

**c.    The FLSA's Opt-In Collective Action Procedure Indicates
That Employees May Waive Their Collective Action Rights**

The language of the FLSA's collective action procedure requires a plaintiff to opt-in to

the collective action, creating the inference that an employee may waive his or her right to

participate. Section 29 U.S.C. § 216(b) states that "[n]o employee shall be a party plaintiff

to any [collective] action unless he [or she] gives his [or her] consent in writing to become such a

party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b).

The FLSA requires an employee's affirmative, written consent before he or she can become part

of a collective action. As another district court in the Fourth Circuit has observed: "if an

employee must affirmatively opt in to any such class action, surely the employee has the power

to waive participation in a class action as well." *Feamster*, 2016 WL 722190, at *4 (quoting

*Owen v. Bristol Care, Inc.*, 702 F.3d 1050, 1052–53 (8th Cir. 2013)).

**d.    The Vast Majority of Courts Follow This Interpretation of the
FLSA's Collective Action Procedure**

Indeed, nearly every court to have considered this issue has determined that the FLSA did

not create a non-waivable right to a class action. In the Fourth Circuit, at least two district courts

have concluded that the language of the FLSA and *Adkins* preclude the type of challenge

Plaintiffs bring here. *See Dimery*, 2018 WL 1471892, at *6; *Feamster*, 2016 WL 722190, at *4.

Essentially all but one court of appeals to have considered the waivability of a collective action

procedure concur, and have found that an employee may waive their right to proceed collectively

under the FLSA. *See Walthour v. Chipio Windshield Repair, LLC*, 745 F.3d 1326, 1335 (11th

Cir. 2014); *Owen*, 702 F.3d at 1055; *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 296–97

(2d Cir. 2013); *Vilches v. Travelers Co.*, 413 F. App'x 487, 494 n.4 (3d Cir. 2011); *Carter v.*

*Countrywide Credit Indus.*, 362 F.3d 294, 297 (5th Cir. 2004); *but see Killion v. KeHE Distribs.*, LLC, 761 F.3d 574, 591–92 (6th Cir. 2014).[11]

The statutory language of the FLSA "is unambiguous and the statutory scheme is coherent and consistent." *Ignacio*, 674 F.3d at 254. Looking to the text, structure, and context of the FLSA, the Court is constrained to conclude that the collective action procedure within 29 U.S.C. § 216(b) may be waived by an employee in an otherwise valid contractual agreement.

---

[11] Plaintiffs contend, correctly, that most of these courts of appeal analyzed the text of FLSA in the context of enforcing an arbitration agreement. But that does not create a material difference in the Court's analysis for two reasons. First, regardless of whether analyzed in the context of enforcing an arbitration agreement or an agreement to proceed in a solitary suit, the plain text and structure of the FLSA do not prohibit an employee from waiving his or her right to proceed in a collective action. FLSA's "statutory language is unambiguous and the statutory scheme is coherent and consistent." *Ignacio*, 674 F.3d at 254. Because Congress has not manifested an intent to create a non-waivable right to a collective action, judicial inquiry must end at the statutory text. *Id.*

Second, despite being viewed favorably, arbitration agreements are not afforded special status above other contracts. *See Adkins*, 303 F.3d at 499 ("courts cannot treat arbitration in general as an inferior or less reliable means of vindicating important substantive rights"). Section 2 of the Federal Arbitration Act (FAA) "places arbitration agreements on equal footing with all other contracts" like those which Plaintiffs agreed to here. *Muriithi v. Shuttle Express, Inc.*, 712 F.3d 173, 178 n.5 (4th Cir. 2013) (quoting *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006)).

Indeed, two district courts within the Fourth Circuit to have considered the waivability of a collective action procedure have found that *even in the absence of an arbitration agreement*, an employee may validly waive his or her right to proceed collectively under the FLSA. *See Feamster*, 2016 WL 722190, at *4; *Dimery*, 2018 WL 1471892, at *6. The United States Court of Appeals for the Fifth Circuit has more expressly observed that "there is no logical reason to distinguish a [collective action] waiver in the context of an arbitration agreement from a [collective action] waiver in the context of any other contract." *Convergys Corp. v. NLRB*, 866 F.3d 635, 639 (5th Cir. 2017) (internal citations omitted).

The Court's conclusion that the FLSA allows waiver of the right to a collective action therefore pertains whether or not an arbitration agreement is at issue. Congress has not expressed an intent to create a non-waivable right to a collective action in the FLSA. And arbitration agreements should not be enforced any more or less rigorously than the plain terms of the Severance Agreements at bar.

**C.    The Language of the ADEA Indicates that Employees May Waive Their Right to Proceed in a Collective Action Under the Statute**

The language of the ADEA compels the same result as the FLSA. As with the FLSA, the

Court begins with the language of the ADEA. Next, the Court will discuss the similarities

between the language of the ADEA and the FLSA, as well as Supreme Court precedent holding

that the ADEA does not bar waiver of a right to collective action. Finally, the Court discusses

the OWBPA, noting that its additional language concerning waiver does not alter the Court's

determination that the ADEA does not create a non-waivable right to a collective action.

### 1.    The Text of the ADEA

Turning to the language of the ADEA, the Court notes that the ADEA expressly

"incorporates large sections of the FLSA's enforcement structure by reference." *Adkins*, 303

F.3d at 506; *see also Baltimore Cty*, 904 F.3d at 335 (finding the history of the ADEA "further

suggests that Congress consciously chose to incorporate the powers, remedies, and procedures of

the FLSA into the ADEA"). Section 29 U.S.C. § 626(b) states under the title[12] "Enforcement:

Prohibition of Age Discrimination *Under Fair Labor Standards . . .*" that:

> [t]he provisions of this chapter shall be enforced in accordance with the powers,
> remedies, and procedures provided in sections 211(b), 216 (except for subsection
> (a) thereof), and 217 of this title, and subsection (c) of this section. Any act
> prohibited under section 623 of this title shall be deemed to be a prohibited act
> under section 215 of this title. Amounts owing to a person as a result of a violation
> of this chapter shall be deemed to be unpaid minimum wages or unpaid overtime
> compensation for purposes of sections 216 and 217 of this title

29 U.S.C. § 626(b) (emphasis added).

Section 216, of course, contains the enforcement mechanism of the FLSA. Under

§ 626(c)(1), the ADEA provides that any aggrieved person "may bring a civil action in any court

---

[12] Statute headings and titles are merely informative and "are not meant to take the place of the detailed provisions in the text." *Bhd. of R.R. Trainmen v. Baltimore & O. R. Co.*, 331 U.S. 519, 528 (1947).

of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter" although their right to do so "shall terminate upon the commencement of an action by the Equal Employment Opportunity Commission to enforce the right of such employee under this chapter." 29 U.S.C. § 626(c)(1). The ADEA also stringently provides that a person "*shall* be entitled to a trial by jury of any issue of fact in any such action for recovery of amounts owing as a result of a violation of this chapter." 29 U.S.C. § 626(c)(2) (emphasis added).

> **2.    The Similarities Between the ADEA and the FLSA, and the Supreme Court's Interpretation of the ADEA, Mandate that the ADEA Does Not Create a Non-Waivable Right to a Collective Action**

The ADEA incorporates many of the same enforcement mechanisms as the FLSA. At least two of these provisions require that this Court find that a collective action under the ADEA may be waived. First, a collective action under the ADEA, as under the FLSA, "may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). Like the FLSA, this ADEA language is permissive, not mandatory, while other language within the statute includes more mandatory terms. Second, because the ADEA adopts the FLSA's enforcement mechanisms, the ADEA expressly incorporates the FLSA's opt-in procedure for class actions. *See Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1212 (5th Cir. 1995) (finding that the ADEA "explicitly incorporates section 16(b) of the Fair Labor Standards Act" meaning an "ADEA action follows an 'opt-in' rather than an 'opt-out' procedure"); *see also Krane v. Capital One Servs.*, 314 F. Supp. 2d 589, 600 (E.D. Va. 2004) ("Class actions under the ADEA are governed generally by the provisions of the [FLSA] . . . [t]hus, a plaintiff must affirmatively opt in to an ADEA class action by filing a consent with the court.").

22

As with the FLSA's opt-in procedure, "if an employee must affirmatively opt in to any such class action, surely the employee has the power to waive participation in a class action as well." *Feamster*, 2016 WL 722190, at *4 (quoting *Owen*, 702 F.3d at 1052–53). In sum, the similarities between FLSA and the ADEA compel the conclusion that in enacting the ADEA, Congress did not intend that an employee's ability to bring a collective action would be non-waivable.

Indeed, the Supreme Court of the United States already has reached this conclusion. Considering the language of the ADEA's enforcement provisions, the Supreme Court concluded, in the context of a motion to compel arbitration, that "the fact that the [ADEA] provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 32 (1991) (internal citations omitted). As with arbitration agreements, nothing in the text of the ADEA precludes an employee from waiving his or her right to proceed in a collective action and bringing a claim against the employer solely on an individual basis. Congress did not intend "[i]ndividual attempts at conciliation," whether through an arbitration agreement or an individual suit, "to be barred." *Id.* Neither the ADEA, nor the OWBPA's amendments as discussed below, prevented Hutchens from waiving her ability to bring a collective action against Capital One.

3.      **The OWBPA's Language Prohibiting Waiver of a Right or Claim Unless That Waiver Is "Knowing or Voluntary" Does Not Eliminate the Ability to Waive a Collective Action**

Although the ADEA, as amended by the OWBPA, states that "[a]n individual may not waive any right or claim under this chapter unless the waiver is knowing and voluntary," 29

23

U.S.C. § 626(f)(1), that provision does not limit Hutchens's ability to waive her right to proceed

in a collective action.[13]

The Supreme Court has held that ADEA § 626(f)(1) does not prevent an employee from

waiving or otherwise limiting the form in which his or her ADEA claim is brought. *14 Penn*

*Plaza LLC v. Pyett*, 556 U.S. 247, 259 (2009). The "knowing and voluntary" language of the

OWBPA does not bar an arbitration agreement. As the Supreme Court stated in *Penn Plaza*:

> Respondents incorrectly counter that an individual employee must personally
> waive a [substantive] right to proceed in court for a waiver to be knowing and
> voluntary under the ADEA. 29 U.S.C. § 626(f)(1). As explained below, however,
> the agreement to arbitrate ADEA claims is not the waiver of a substantive right as
> that term is employed in the ADEA.

*Id.* (internal quotation marks and citations omitted). If, under *Penn Plaza*, an employee may

waive his or her ability to proceed in a collective action *and* in a judicial forum by agreeing to

arbitration, then it follows that the same employee would be able to *solely* waive their ability to

proceed in a collective action.

---

[13] The OWBPA replaced the supervision mechanism contained within 29 U.S.C. § 216(c)
for ADEA claims. On July 1, 1979, the Equal Employment Opportunity Commission ("EEOC")
assumed enforcement and administrative authority over the ADEA from the Secretary of Labor.
H.R. Rep. No. 101-664 at 19. Reorg. Plan No. 1 of 1978, 3 C.F.R. 321 (1978). The EEOC
struggled to quickly resolve the growing number of ADEA cases, and grew concerned that a
delay in granting waivers would "delay the provision of valuable benefits or additional
compensation to older employees who freely choose to release their ADEA rights or claims."
*See* 52 FR 32293-01 (Aug. 27, 1987).
To remedy this delay, the EEOC proposed a rule permitting "knowing and voluntary" but
unsupervised waivers under the ADEA. *See* 52 FR 32293-01 (Aug. 27, 1987); *see also Manning
v. New York Univ.*, No. 98cv3300, 2001 WL 963982, at *13–14 (S.D.N.Y. Aug. 22, 2001)
(recounting history). The EEOC determined that the purposes of the ADEA would be best
served by permitting "employers and employees to settle disputes by using waiver agreements as
long as the waiver of rights and release of potential liability [was] 'knowing and voluntary.'"
*See* 52 FR 32293-01 (Aug. 27, 1987). Congress eventually adopted the "knowing and
voluntary" language in the OWBPA. 29 U.S.C. § 626(f)(1).

One court within this district has rightly concluded that *Penn Plaza* mandates the enforcement of arbitration agreements even where a plaintiff would not be able to obtain a jury trial as provided under the ADEA. *See Bennett v. Dillard's, Inc.*, 849 F. Supp. 2d 616, 620 (E.D. Va. 2011) (determining that a plaintiff had waived the right to a jury trial under the ADEA by signing an arbitration agreement, and finding that *Penn Plaza* resolved "any doubts about the validity of pre-dispute arbitration agreements" under the ADEA). Numerous courts of appeals concur with that analysis.[14] *See Rosenberg v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 170 F.3d 1, 21 (1st Cir. 1999); *Williams v. Cigna Fin. Advisors, Inc.*, 56 F.3d 656 (5th Cir. 1995). Although not explicitly discussed in *Penn Plaza*, the act of compelling arbitration of ADEA claims would prevent an ADEA litigant from enforcing his or her right to a jury trial under the statute. *See* 29 U.S.C. § 626(c)(2) (a person "shall be entitled to a trial by jury of any issue of fact in any such action for recovery of amounts owing as a result of a violation of this chapter").

As noted above, ADEA § 626(c)(2)'s language mandating that an employee be entitled to a trial by jury under the ADEA is stringent. A person "*shall* be entitled to a trial by jury" on their claims under the ADEA. 29 U.S.C. § 626(c)(2) (emphasis added). If the "knowing and voluntary" language of § 626(f)(1) does not apply to the mandatory language as "*shall* be entitled to a trial by jury," 29 U.S.C. § 626(c)(2) (emphasis added), then Congress likely did not intend for it to apply to the far more permissive language of the collective action procedure. *See*

---

[14] The Fourth Circuit has similarly held that an employee may waive his or her ability to proceed in a jury trial under the ADEA, finding that the "ADEA provides only that a litigant be entitled to a jury trial should he [or she] desire it; it does not mandate that every ADEA trial be a trial by jury. ADEA litigants plainly are permitted to waive trial by jury." *Gilmer v. Interstate/Johnson Lane Corp.*, 895 F.2d 195, 199 (4th Cir. 1990), *aff'd*, 500 U.S. 20 (1991). The Fourth Circuit's decision in *Gilmer* and the Supreme Court's affirmance of that decision, however, analyzed an arbitration agreement that predated the enactment of the OWBPA. *See Hammaker v. Brown & Brown, Inc.*, 214 F. Supp. 2d 575, 579 n.4 (E.D. Va. 2002) ("The OWBPA applies to waivers executed on or after October 16, 1990.") (citing OWBPA § 202(a).)

29 U.S.C. § 216(b) (an action *"may* be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated" (emphasis added)).

The OWBPA's limit on the waiver of certain rights does not preclude waiver of every possible manner of enforcing one's rights under the statute, but merely the "statutory right to be free from workplace age discrimination." *Penn Plaza,* 556 U.S. at 265. Here, the OWBPA did not limit Hutchens's ability to waive her right to bring a collective action under the ADEA.[15]

### D.  Plaintiffs' Public Policy Arguments Contravene Binding Precedent

Neither the FLSA nor the ADEA create a binding, non-waivable right to proceed in a collective action. Plaintiffs nonetheless urge the Court to find that the Collective Action Waiver within their Severance Agreements contravenes public policy and declare the waiver invalid. Because these arguments contravene binding precedent and the plain text of the statutes, the Court declines to do so.[16]

---

[15] The Court's analysis concerning the collective action waiver and the ADEA does not affect or otherwise resolve Hutchens's claim in Count I of her Complaint that Capital One failed to abide by the statutory requirements of the OWBPA. (*Id.* ¶¶ 67–75.)

[16] The Court notes that the "use of public policy to void written contracts is dangerous because public policy itself is often a two-edged sword." *Westvaco Corp. v. United Paperworkers Int'l Union ex rel. Local Union 676,* 171 F.3d 971, 977 (4th Cir. 1999). Often "ruling on behalf of one public policy" may fail to "take account of countervailing public policies." *Id.* For instance, Plaintiffs argue that they should not be allowed to waive their right to bring a collective action, and that strict limitations on waiver advance public good. But, in the context of ADEA claims, the EEOC adopted a rule making it easier for workers to waive their claims because agency backlogs in granting waivers had "delay[ed] the provision of valuable benefits or additional compensation to older employees who freely cho[]se to release their ADEA rights or claims." *See* 52 FR 32293-01 (Aug. 27, 1987). Congress later adopted the EEOC's rule in the OWBPA and allowed employees to waive ADEA claims so long as the waiver was "knowing and voluntary." 29 U.S.C. § 626(f)(1).
Thus, Courts must remain mindful that restrictions on waiver may cut both ways. *Westvaco Corp.,* 171 F.3d at 977. Imposing stringent restrictions on an employee's ability to waive certain rights may protect workers, but loosening restrictions on waiver might serve another public good: efficiency of recovery. Congress, not the judiciary, is better positioned to weigh such countervailing public policy factors and strike the appropriate balance.

First, Plaintiffs, relying on the Supreme Court's decision in *Brooklyn Savings Bank v. O'Neil*, argue that a "statutory right conferred on a private party, but affecting the public interest, may not be waived or released if such waiver or release contravenes the statutory policy." 324 U.S. 697, 704 (1945). Plaintiffs reason that allowing waiver of the collective action procedures contained within the FLSA frustrates "Congress'[s] policy of ensuring uniform minimum-pay standards" and "the statutory policies underlying the ADEA as a whole." (Pls.' Mem. Supp. Mot. Judg. Plead. 12, 19.) But, as many courts correctly acknowledge, *O'Neil* specifies that "whether the statutory right may be waived depends upon the intention of Congress as manifested in the particular statute." 324 U.S. at 705; *see also Midgett*, 198 F.3d at 145–46 (finding analysis must "begin, as always, with the language of the statutory text," and "[i]n the absence of a definition from Congress, [the Court] accord[s] words in a statute their ordinary, contemporary, common meaning"). Congressional intent, as it pertains to the FLSA and ADEA, is clear. Both statutes demonstrate through their text and their structure that an employee may waive his or her right to proceed in a collective action. Because the "statutory language is unambiguous and the statutory scheme is coherent and consistent," the Court cannot consider the broad public policy arguments Plaintiffs press here. *Ignacio*, 674 F.3d at 254.[17]

Second, the Supreme Court has addressed and rejected several of the public policy arguments that Plaintiffs advance. For instance, Plaintiffs contend that the "the primary policy

---

[17] Plaintiffs cite a substantial amount of legislative history in support of their view that the collective action mechanism might prove an effective enforcement tool in vindicating their rights under the FLSA. (Pls.' Mem. Supp. Mot. Judg. Plead. 9–13.) But nowhere does that legislative history evince an intent by Congress to foreclose an employee from waiving their right to a collective action. As the United States Court of Appeals for the Eleventh Circuit has observed, the FLSA's legislative history does "not show that Congress intended the collective action provision to be essential to the effective vindication of the FLSA's rights." *Walthour*, 745 F.3d at 1335. The "FLSA's legislative history supports only a general congressional intent to aid employees who lacked sufficient bargaining power to secure for themselves a 'minimum subsistence wage.'" *Id.*

concern animating Congress's adoption of the collective-action mechanism in the FLSA and ADEA was the desire to promote the effective and efficient vindication of the core substantive rights protected by those statutes." (Pls.' Mem. Supp. Mot. Judg. Plead. 2.) In Plaintiffs' view, the collective action procedure functions as an essential tool in easing "the prohibitive burdens and costs that individual litigation imposes on employees and ensuring efficiency in the judicial system." (*Id.* 3.) But the Supreme Court has held, in the context of enforcing collective action waivers, that "the fact that it is not worth the expense involved in *proving* a statutory remedy does not constitute the elimination of the *right to pursue* that remedy." *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013) (emphasis in original). When a collective action waiver limits a dispute to two parties, it "no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938." *Id.* No doubt exists that the collective action procedure provides a useful tool in vindicating Plaintiffs' rights. But under the text of the respective statutes and binding precedent, Plaintiffs were permitted to release the use of that particular tool, so long as doing so did not violate another law.

Plaintiffs public policy arguments find no persuasive support in the statutory text, and none in Fourth Circuit or Supreme Court precedent. Congress, through the statutory text, permitted an employee to waive his or her ability to bring a collective action under the FLSA and the ADEA, and the Court is constrained by that legislative expression.

### E.   The Collective Action Waiver Contained Within Hutchens's and Stirnweis's Severance Agreements Is Enforceable Under Federal Law

Considering the text and structure of the FLSA and ADEA, the Court determines, alongside others, that neither statute precludes an employee from waiving their right to proceed in a collective action in a severance agreement. The Court now turns to the language of the

Severance Agreements themselves, finding that they cover the claims asserted in Hutchens's and Stirnweis's Complaints, and prevent them from bringing a collective action under the ADEA and FLSA respectively.

## IV.  Analysis:  The Scope of the Collective Action Waiver

Plaintiffs argue that even if this Court were to find their Severance Agreements "enforceable, they do not cover Plaintiffs' right to proceed collectively under the FLSA and ADEA." (Pls.' Mem. Supp. Mot. Judg. Plead. 28.)  Because the plain language of the Severance Agreements covers Plaintiffs' ability to bring a collective action pursuant to the FLSA and ADEA under Virginia law,[18] the Court finds this argument unavailing.

### A.    Principles of Contract Interpretation Under Virginia Law

The principles governing contract interpretation in the Commonwealth of Virginia are well established. *Wood v. Symantec Corp.*, 872 F. Supp. 2d 476, 481 (E.D. Va. 2012). "Under Virginia law, '[c]ontracts are construed as written, without adding terms that were not included by the parties.'" *Harris v. Mariner Fin. LLC*, No. 3:18cv588, 2019 WL 4060336, at *7 (E.D. Va. Aug. 28, 2019) (quoting *TM Delmarva Power, L.L.C. v. NCP of Va., L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002).  When the language of a contract is "clear and unambiguous, the contract must be construed according to its plain meaning." *Parikh v. Family Care Ctr., Inc.*, 641 S.E.2d 98, 100 (Va. 2007); *see also Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 405 (4th Cir. 1998) ("Virginia strictly adheres to the 'plain meaning' rule, entitling the parties to rely on the express terms of the written agreement"). "Importantly, '[w]ords that the parties used are

---

[18] The Severance Agreements include a "Choice of Law/Forum" provision stating that the agreements "shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia without any regard to any principles of conflicts of law." (Hutchens Severance Agr. 9–10; Stirnweis Severance Agr. 9.)  Neither Party disputes that Virginia law applies to the Severance Agreements.

normally given their usual, ordinary, and popular meaning.'" *Chesapeake Bay Enterprises, Inc. v. Chesapeake Tr.*, No. 3:15cv35, 2015 WL 5786831, at *3 (E.D. Va. Sept. 30, 2015) (quoting *D.C. McClain, Inc. v. Arlington Cty.*, 452 S.E.2d 659, 662 (Va. 1995)). "No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *Id.*

Where possible, the "court must read the contract as a single document, the meaning of which is gathered from all its associated parts when assembled as the unitary expression of the agreement of the parties." *First Am. Title Ins. Co. v. Seaboard Sav. & Loan Asso.*, 315 S.E.2d 842, 845 (1984) (internal citations omitted). Courts must look to "the intention of the parties as expressed by them in the words they have used, and . . . are bound to say that the parties intended what the written instrument plainly declares." *Meade v. Wallen*, 311 S.E.2d 103, 104 (Va. 1984) (internal citations omitted).

"To state a claim for breach of contract under Virginia law, a plaintiff must plausibly allege in federal court:  (1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of the obligation; and, (3) an injury or harm caused by the defendant's breach." *Hardnett v. M&T Bank*, 204 F. Supp. 3d 851, 860 (E.D. Va. 2016) (citing *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).

### B.        Under The Plain Language of Her Severance Agreement, Stirnweis Waived Her Ability to Bring a Collective Action Under the FLSA

The plain language of Stirnweis's Severance Agreement bars her from bringing a collective action under the FLSA.  The Collective Action Waiver states that

> [i]f any claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action.

(Stirnweis Severance Agr. 3.)  The plain meaning of the Collective Action Waiver unambiguously waives the "right or ability" to participate in a "class or collective action" for "any claim . . . not subject to release." (*Id.*)  The Court therefore must only determine whether Stirnweis's FLSA claims were "not subject to release."[19]  (*Id.*)

### 1.   Stirnweis's FLSA Claims Were Not Subject to Release Under the Terms of Her Severance Agreement

As presented in the Severance Agreement, Stirnweis's FLSA claims were "not subject to release." (*Id.*)  In the section titled "Types of Claims Waived," the Severance Agreement specified that the "release includes all claims of any kind, whether known or unknown . . . except for claims that the *law does not permit you to waive by signing this Agreement*." (*Id.* (emphasis added)).

As stated above, Stirnweis was not permitted to waive her FLSA claims by "signing th[e] Agreement" with Capital One, (*id.* 3), but could do so legally only under the supervision of the Secretary of Labor. *See* 29 U.S.C. § 216(c).  Therefore, because Stirnweis's FLSA claims were "not subject to release" as defined in her Severance Agreement, she waived the "right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action." (Stirnweis Severance Agr. 3.)

### 2.   Stirnweis's FLSA Claims Are Still "Claims" Under the Agreement Despite Her Warranty That She Had Been Paid All Overtime

Stirnweis also contends that any assertions or entitlement to overtime compensation under the FLSA did not fall under the plain meaning of "claim" as used in the collective action

---

[19] Plaintiffs also assert that the term "release" only applies to "future claims only." (Pls.' Mem. Supp. Mot. Judg. Plead. 2).  The Court need not pause long on this contention.  The meaning of the term release, as defined in the Severance Agreements, includes "all claims of any kind, whether known or unknown . . . except for claims that the law does not permit you to waive by signing this Agreement." (Stirnweis Severance Agr. 3; Hutchens Severance Agr. 3).  The plain language clearly intends for the release to apply to past claims.

waiver. Because Stirnweis signed a warranty representing that she was "paid all wages [and] overtime . . . amounts that Capital One or any of the Released Parties should have paid [her] in the past," (Stirnweis Severance Agr. 4), she asserts she had no "claim" or "legal 'demand' or 'assertion' for 'compensation, payment or reimbursement.'" (Pls.' Mem. Supp. Mot. Judg. Plead. 30 (quoting Black's Law Dictionary, "Claim")). Under that reasoning, the Collective Action Waiver would not apply to her FLSA "claim" because she had disavowed any FLSA "claim" at all. This line of argument fails to persuade for two reasons.

First, the broad language of the Severance Agreement precludes Stirnweis's reading. The Severance Agreement includes a release of "all claims of any kind, whether known or unknown . . . except for claims that the law does not permit you to waive by signing this Agreement." (Stirnweis Severance Agr. 3.) Looking to the "intention of the parties as expressed by them in the words they have used," the Severance Agreement plainly indicates that Stirnweis will release any demand or assertion for damages, whether or not she has made a factual statement to the contrary about her right to those damages. *Meade*, 311 S.E.2d at 104 (courts are "bound to say that the parties intended what the written instrument plainly declares").

Second, and more fundamentally, Stirnweis's interpretation yields mutually contradictory results. Put simply, Stirnweis cannot continue to prosecute her action while simultaneously avowing that she has no right to do so. *See Rowe v. Commonwealth*, 675 S.E.2d 161, 164 (Va. 2009) (determining that a litigant cannot take legal positions that are "inconsistent with each other" in the same litigation (internal citations omitted)).[20]

---

[20] If Stirnweis did not possess a "claim" under the meaning of the Severance Agreement, then she, by her own admission, could not pursue the present action, either on an individual or a collective basis, to recover overtime under the FLSA. (Stirnweis Severance Agr. 3.) Under this reading, she already disavowed any right to such damages. If, on the other hand, Stirnweis did possess a "claim" under the FLSA (as she seems to indicate by filing this suit) then the

Where possible, the "court must read the contract as a single document, the meaning of which is gathered from all its associated parts when assembled as the unitary expression of the agreement of the parties." *Seaboard Sav.*, 315 S.E.2d at 845. Reading Stirnweis's Severance Agreement "as a single document," the Court concludes that she waived her ability to bring any collective action claim under the FLSA. *Id.*

### C.     Under The Plain Language of Her Severance Agreement, Hutchens Waived Her Ability to Bring a Collective Action Under the ADEA

The plain language of Hutchens's Severance Agreement, reading the document as a whole, similarly bars her from bringing a collective action under the ADEA. As with Stirnweis's Severance Agreement, the Collective Action Waiver in Hutchens's Severance Agreement states that "[i]f any claim is not subject to release, to the extent permitted by law, you waive any right or ability to be a class or collective action representative or to otherwise participate in any putative or certified class, collective or multi-party action." (Hutchens Severance Agr. 3.) The Court again must determine whether Hutchens's ADEA claims were "not subject to release" under the plain meaning of her Severance Agreement. (*Id.*)

Another provision of Hutchens's Severance Agreement impacts the Court's interpretation. In a section entitled "Notification of ADEA Rights and Claims," the Severance Agreement states: "you understand that this Agreement specifically releases and waives all claims you may have for age discrimination under the ADEA, except for those that may arise after the date this Agreement is executed by you." (*Id.* 4.) Propounding an argument echoing Stirnweis, Hutchens argues that because she "release[d] and waive[d] all claims . . . for age discrimination," any assertions she could make under the ADEA ceased to be a "claim . . . *not*

_____

Collective Action Waiver would prevent her from bringing that claim on a collective basis. (*Id.*) Either way, Stirnweis cannot proceed collectively.

33

*subject to release.*" (*Id.* 3, 4 (emphasis added)). Under Hutchens's interpretation, her ADEA claims were "subject to release" because she had in fact released them; therefore, the Collective Action Waiver should not apply. (*Id.* 3.) Hutchens's attack on the contractual language falters under a straightforward reading of the plain language of her Severance Agreement.

The Severance Agreement plainly divides claims into two groups. The first group includes " all claims of any kind, whether known or unknown" that Hutchens agreed to release by signing the Severance Agreement. (*Id.*) The second group consists of "claims that the law does not permit you to waive by signing this Agreement." (*Id.*) This second group of claims which are "not subject to release" fall under the Collective Action Waiver. (*Id.*)

Hutchens's ADEA claims founder under either definition. And under either definition, Hutchens cannot bring or participate in a collective action under the ADEA. If Hutchens's ADEA claims are "subject to release," then she released those claims by waiving "all claims you may have for age discrimination under the ADEA." (*Id.* 3, 4.) Under that interpretation, Hutchens does not have standing to bring an action, collective or otherwise, against Capital One. If, on the other hand, Hutchens could not waive her ADEA claims, then those claims are "not subject to release" and the Collective Action Waiver applies. (*Id.*) Either way, Hutchens interpretation of her Severance Agreement prevents her from bringing a collective action.[21]

---

[21] Because Capital One has not challenged Hutchens's ability to bring her ADEA claims on an individual basis, the Court declines to determine whether Hutchens's claims were "subject to release" under the Severance Agreement, or otherwise interpret the Severance Agreement. The Court merely notes that, regardless of the validity of that waiver, Hutchens cannot bring a *collective action* pursuant to the ADEA.

**D.      The Plain Language of the Severance Agreements Bars Hutchens and
Stirnweis from Bringing a Collective Action Under the ADEA and FLSA**

Looking to the plain meaning of the Severance Agreements, the Court concludes that the

Severance Agreements bar Hutchens and Stirnweis from bringing a collective action under both

the ADEA or FLSA.

## V.  Conclusion

For the foregoing reasons, the Court will grant Capital One's Motion for Judgment on the

Pleadings, and deny Plaintiffs' Motion for Judgment on the Pleadings.  The Court will dismiss

Plaintiffs' claims for a declaratory judgment that the Collective Action Waiver is invalid brought

in Count III of Hutchens's Complaint and Count II of Stirnweis's Complaint.  Hutchens may

proceed on her individual claims under the OWBPA and the ADEA against Capital One, while

Stirnweis may proceed on her individual claim under the FLSA against Capital One.

An appropriate Order shall issue.

                                                            /s/
                                                    M. Hannah Lauck
                                                    United States District Judge

Date: 6/8/20
Richmond, Virginia